No. 86-353

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

_____

IN RE THE MATTER OF
R.A.D. and J.D.,
Youths in Need of Care.

_____

APPEAL FROM:   District Court of the Eighth Judicial District,
               In and for the County of Cascade,
               The Honorable Thomas McKittrick, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Matteucci & Falcon; Daniel L. Falcon, Great Falls,
        Montana
        Patrick F. Flaherty, Great Falls, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        John Paulson, Asst. Atty. General, Helena
        Patrick L. Paul, County Attorney, Great Falls, Montana
        Barbara Bell, Deputy County Atty., Great Falls
        E. June Lord, (for children), Great Falls, Montana

                           _____

                           Submitted on Briefs:   Sept. 10, 1987

                                 Decided:   March 18, 1988

Filed: MAR 1 8 1988

                    *Ethel M. Harrison*
_____
                Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

These appeals arise from a termination of parental rights of E.D. (mother) and R.D. (father) by the District Court of the Eighth Judicial District, Cascade County, and awarding to the Department of Social and Rehabilitation Services permanent custody of the youths, R.A.D. and J.D., with the authority to consent to adoption. Defendants-appellants, natural parents of the youths, each appeal the rulings.

We affirm in part and reverse and remand in part.

The issues we are presented with on this appeal are as follows:

1. Did the District Court abuse its discretion in denying the father's motion to dismiss for reasons of delay and prejudice?

2. Whether the District Court erred in allowing R.A.D. and J.D. to testify as competent witnesses?

3. Whether the District Court abused its discretion in terminating the father's parental rights?

4. Did the District Court err in denying the mother's motion to continue because she could not attend a hearing as she was committed at Warm Springs State Mental Hospital?

A previous history of the mother and father should initially be noted. The two were married in 1978. The mother developed mental problems and was committed numerous times. On November 21, 1983, the father filed a petition for dissolution of marriage. His counsel at the time was Michael Smartt. From 1978 through 1983, the father was largely responsible for raising the children, R.A.D. and J.D., until

they were placed in the custody of the Montana Department of Social and Rehabilitation Services (SRS).

On February 1, 1984, the deputy county attorney of Cascade County filed, on behalf of SRS, a petition for temporary investigative authority and protective services and temporary custody of R.A.D. and J.D. The petition alleged that the youths were abused and neglected or in danger of being abused and neglected pursuant to §§ 41-3-101 and 41-3-102, MCA. An attached affidavit stated that SRS received a referral, sometime in January, that the father had sexually abused his two sons, R.A.D. and J.D. On January 27, 1984, R.A.D. and J.D. told an SRS caseworker, Irene Johnson, that their father had sexual contact with them. The District Court ordered temporary investigative authority and temporary custody of R.A.D. and J.D. to SRS because there was probable cause that the youths were youths in need of care and in immediate or apparent danger of harm. Following a show cause hearing, the court made a specific conclusion of law in an order dated March 12, 1984, that the youths were abused and neglected within the meaning of the statutes. The father was directed to receive a psychological evaluation

Both children were seen by Dr. Tom Krajacich to whom they related similar stories as they told Johnson. The father was seen by Dr. William Taylor on May 11, 1984, but Taylor did not conduct specific testing to evaluate a sexual abuser because he felt the father did not fit the personality profile of a sexual abuser. At a December 18, 1984 hearing both Krajacich and Johnson stated they believed the children were telling the truth as to the sexual contacts. On December 26, 1984, the District Court issued an order that in the best interests of the youths, the father should be reevaluated by Dr. Phillip Russell of Billings and that

3

"[t]he parties . . . agreed to abide by the recommendations of Dr. Russell."

Dr. Russell's evaluation occurred July 16, 1985. His most crucial conclusions are as follows:

> 1. [The father] is, at least capable of perpetuating the alleged acts. 2. [T]he examiner had the impression that [the father] did not give a candid or honest account of his actual sexual experiences. 3. The statements from the victims in this case were given to competent and experienced professionals and appear to be bonafide reports of sexual abuse and have been substantiated by other behavioral indicators. . . It is the examiner's opinion that the sexual abuse reported by [R.A.D. and J.D.] did, in fact, occur and was perpetuated by their father. 4. Due to [the father's] denial of the sexual abuse, he is, by definition untreatable for his sexual deviancy . . . and 5. [J.D. and R.A.D.] should not be returned to the custody of their father.

A petition for permanent custody was filed by Cascade Deputy County Attorney Barbara Bell, counsel for SRS on August 26, 1985. From this petition, the court ordered that a hearing be held October 11, 1985. The State was granted a continuance to November 22, 1985 because Dr. Russell was unavailable. The mother, because she was residing at Warm Springs State Hospital at this time and wanted an opportunity to be present and testify, motioned the court for a continuance. In regard to this motion, the District Court stated:

> [P]arties stipulate that the hearing set for 11/22/85 @ 9:00 a.m. will go as scheduled, in regard to [the father] only. A hearing as to [the mother] will be held at a later date, due to [the mother] being at Warm Springs State Hospital.

4

On November 22, 1985, a hearing was held in regard to the permanent custody of the youths limited to their father. Dr. Russell, Dr. Krajacich, Irene Johnson, Helen (Meg) Timblin, foster mother, and R.A.D. and J.D. testified for the State. Pam Tanner, a prior employee of SRS and foster parent who knew the father on a personal basis, testified for the father.

The District Court ordered that another hearing would be held January 6, 1986. After three continuances were granted the mother because her attorney was unavailable due to conflicting criminal trials, the date of the second hearing was set for April 16, 1986. The mother's attorney made a motion for another continuance on April 14, 1986 because the mother was not able to attend the hearing due to her mental condition according to her treating psychiatrist, Dr. Myron Meinhardt. At the April 16, 1986 hearing, the father's attorney made a motion to dismiss the case due to denial of due process. Both motions were denied. At the two-day hearing, the father testified in his own behalf, and a number of witnesses supported his testimony. The State called Dr. Meinhardt and the children's grandmother, Elanor.

On June 5, 1986, the District Court entered its findings of fact, conclusions of law and order permanently terminating parental rights of and giving permanent custody to SRS with the right to consent to adoption. It is from this ruling that these appeals arise.

We have recognized that family integrity is a constitutionally protected interest. Matter of J.L.B. (1979), 182 Mont. 100, 594 P.2d 1127. In J.L.B., we cited the language of the United States Supreme Court case of Stanley v. Illinois (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-1213, 31 L.Ed.2d 551, 558-559:

5

> The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential", [citation omitted] "basic civil rights of man" [citation omitted] and "[r]ights far more precious . . . than property rights", [citation omitted]. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." [Citation omitted.] The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, [citation omitted], the Equal Protection Clause of the Fourteenth Amendment [citation omitted], and the Ninth Amendment. [Citation omitted.]

J.L.B., 182 Mont. at 109, 594 P.2d at 1132.

However, the right to maintaining the family unit is not absolute. Absent a clear showing of abuse of discretion by the District Court, we will not reverse.

> [T]his Court is mindful that the primary duty of deciding the proper custody of children is the task of the district court. As a result, all reasonable presumptions as to the correctness of the determination by the district court will be made. Foss v. Leifer, 170 Mont. 97, 550 P.2d 1309, 33 St.Rep. 528 (1976). Due to this presumption of correctness, the district court's findings will not be disturbed unless there is a mistake of law or a finding of fact not supported by credible evidence that would amount to a clear abuse of discretion.

Matter of C.A.R. (Mont. 1984), 693 P.2d 1214, 1218, 41 St.Rep. 2395, 2398-2399.

The father contends the District Court abused its discretion when it denied (by implication of the order issued June 5, 1986) his motion to dismiss for reasons of delay and prejudice. Granted, a number of motions to continue were allowed in this case, but § 25-4-503, MCA, states that the District Court "[m]ay, in its discretion, postpone a trial or proceeding upon other grounds than the absence of evidence under such conditions as the court may direct." (Emphasis added.) The District Court had the discretion to grant or deny any continuance for justified reasons under the law in Montana.

The father claims that the continuances substantially prejudiced him because the District Court had bifurcated the trial on November 22, 1985 and the hearing was continued as to him only. We find this to be incorrect according to the record. On Monday, November 18, 1985 the following testimony occurred:

> Mr. Falcon (Counsel for the father): [I] believe we can stipulate, if the parties will, that the hearing on Friday will be in regards to the State versus [the father's] activities, and will reserve until later all the issues dealing with [the mother].
>
> Ms. Macek (Counsel for the mother): Your Honor, I would have no problem with that. The only motion to continue wanted was as far as [the mother] was concerned.
>
> Ms. Bell (Counsel for the State): Your Honor, I believe Mr. Falcon has correctly stated the agreement we have reached.

The record indicates the District Court noted the issue of the mother's rights were to be determined at a later date. The trial was therefore not "bifurcated" as the father

7

argues. The court merely allowed testimony in regards to the father and reserved consideration of the mother's interest until a later date, ultimately April, 1986.

The father contends that the court failed to hear and determine within twenty days whether R.A.D. and J.D. were abused, neglected or dependent. He argues that § 41-3-401(2), MCA, required:

> Upon receipt of a petition, the court shall set a date for an adjudicatory hearing on the petition. Such petitions shall be given preference by the court in setting hearing dates and must be heard within 20 days of the filing of the petition. (Emphasis added by appellant.)

This amendment was effective October 1, 1985 but the petition was filed February 1, 1984 when § 41-3-401(2) provided only that "[t]he court shall set a date for an adjudicatory hearing on the petition." The State argues that the father's motion to dismiss was made at the hearing to consider termination of the parental rights governed by § 41-3-607(1), MCA. This section requires consideration of termination of parental rights only after the petition for permanent custody is filed and has a 180-day limitation.

> The termination of a parent-child legal relationship shall be considered only after the filing of a petition pursuant to 41-3-401 alleging the factual grounds for termination. Termination of a parent-child legal relationship shall be considered at a dispositional hearing held pursuant to 41-3-406, following or together with an adjudicatory hearing held pursuant to 41-3-404, within 180 days after the filing of the petition. (Emphasis added.)

Section 41-3-607(1), MCA.

In his reply brief, appellant admits that the 180-day limitation is applicable. The petition for permanent custody

8

was filed in this case on August 26, 1985. It is at this point that the 180-day limitation becomes effective. Nonetheless, a hearing was held by November 22, 1985, well within the 180-day time limitation.

The father argues the statute amendments are procedural and can be applied to cases pending at that time and therefore the 20-day limitation and 180-day limitation should apply. He contends that § 1-2-109, MCA, which requires that "[n]o law . . . is retroactive unless expressly so declared" is not applicable in this case because of the "procedural" nature of the statute's time limitation. State ex rel. Johnson v. District Court of Fourth Judicial District (1966), 148 Mont. 22, 417 P.2d 109, 112. In Boehm v. Alanon Club (Mont. 1986), 722 P.2d 1160, 1162, 43 St.Rep. 1341, 1344, this Court stated:

> The guiding principle in this area is § 1-2-109, MCA, which states: "No law contained in any of the statutes of Montana is retroactive unless expressly so declared." However, it has been held that where a statute is procedural, rather than substantive, § 1-2-109 has no application, and the statute will be applied to a cause of action arising before its enactment.

The State complied with the 180-day limitation. As to the 20-day limitation, if we agree with the father that this law should be retroactive, we must still affirm the court because the 1987 Legislature again amended § 41-3-401(2) so that no 20-day limitation is required. Under the facts of this case, we find that the District Court did not abuse its discretion in denying the motion to dismiss.

The father claims that the District Court abused its discretion in allowing the testimony of R.A.D., who was five years old at the time of the alleged sexual abuse and six

9

years old at the time of the hearing, and J.D., who was three years old at the time of the alleged sexual abuse and five years old at the hearing. Whether a child is competent to testify is a matter left largely to the discretion of the trial court. State v. Howie (Mont. 1987), ____ P.2d ____, ____, 44 St.Rep. 1711, 1716; State v. Rogers (Mont. 1984), 692 P.2d 2, 5, 41 St.Rep. 2131, 2135, quoting State v. Campbell (1978), 176 Mont. 525, 529, 579 P.2d 1231, 1233. Rule 601 M.R.Evid. provides the general rule of competency as follows: "[E]very person is competent to be a witness except as otherwise provided in these rules." For disqualification, Rule 601, M.R.Evid., states that a person is disqualified if he is not able to express himself to the judge or jury or is unable to understand the "duty of a witness to tell the truth."

The father contends that J.D. was incompetent to testify because: he admitted that he would say anything if asked or told to say it; he was unable to tell the difference between a boy and girl doll; he supplied inconsistent testimony in regards to "good touch, bad touch;" and he admitted that telling the truth was bad. As to R.A.D., the father contends he was incompetent because: he was unable to say how many brothers or sisters he had; he admitted on the stand he did not know what "good touch, bad touch" was; and he was inconsistent in regards to the number of times the incident occurred.

From a reading of the record, it is clear that R.A.D. was referring to his foster brothers and sisters who were the children of his foster mother, Helen (Meg) Timblin. The District Court determined the competency of the children by asking questions in regards to the children's understanding of the need for them to tell the truth. The Court then allowed the attorneys to voir dire the youths and finally,

10

the youths were allowed to testify as to the actual sexual contact.

The judge found both children competent to testify. We find that despite the father's claims of inconsistencies, the children did know the difference between a truth and a lie and understood that they needed to be truthful on the stand. In State v. Phelps (Mont. 1985), 696 P.2d 447, 42 St.Rep. 305, the five-year-old victim stated that he believed he was testifying not in the court room but in the police station and that the judge was a karate expert. We found that the youth could tell the difference between the truth and a lie and that was the gravamen ascertainment by the court to determine competency. In State v. D.B.S. (Mont. 1985), 700 P.2d 630, 42 St. Rep. 770, we allowed a four-year-old incest victim to testify despite the fact that she was inconsistent as to when the alleged incident occurred.

> We should recognize that children, particularly four-year-olds are not governed by the clock and calendar . . . [and] are generally at a loss to apply times or dates to significant events in their lives.

D.B.S, supra, 700 P.2d at 634.

We note here that three and five-year-olds are also sometimes going to be inconsistent as to particular incidents or conversations of "good touch, bad touch," and even as to how many brothers and sisters they have as the father's counsel has argued. However, in this case, the testimony was sufficiently consistent as to the actual act by the father that the court properly allowed these children to testify. Dr. Krajacich and Irene Johnson testified that the youths made statements very close to what they testified to in court in the prior two-year period of time. It is this

11

consistency, rather than the minor inconsistencies stated by the father, that is important.

After the youths were determined competent, they both testified that their father had sexually molested them, R.A.D. stated that his father touched him in his "private spot." He also stated that his father engaged in oral contact on this private spot and demonstrated the activity on anatomically correct dolls.

J.D. testified as to "good touch, bad touch" and adequately differentiated between the two by distinguishing a hug by his mother as a "good touch" and a hit by a State's attorney as a "bad touch." He then stated that his father had engaged in bad touch when "[h]e sucked our peepee."

From our review of the record, we conclude that the children were indeed competent to testify and that the testimony describing the incidents of sexual contact go directly to the father's next claim, that the District Court erred in terminating the father's parental rights.

This final argument raised by the father is divided into two parts. First, he argues that he did not receive notice that the November 22, 1985 and April, 1986 hearings were going to be combined adjudicatory and dispositional hearings and that, again, the hearing on the § 41-3-401, MCA, petition was not held within the mandatory 20-day period. Secondly, the father argues that "on the merits" the District Court erred in terminating his parental rights.

We have addressed the contention in regards to the 20-day limitation in § 41-3-401(2) above and therefore will not reiterate our position. The father contends that the continuances granted deprived him of due process and the protection of §§ 41-3-401 and 41-3-607, MCA and that the court improperly terminated his parental rights without a dispositional hearing pursuant to § 41-3-607, MCA. We have

12

thoroughly scrutinized the record in this case and note that numerous continuances were granted. However, from this analysis, we determine that no denial of due process occurred. It is clear that the hearings of November 22, 1985 and April 16 and 18, 1986 were combined adjudicatory and dispositional hearings. As to the claim that notice was not sufficient, § 41-3-607, MCA, expressly allows this combination and does not require specific notice to the parties. In this instance, there was insufficient delay to constitute reversible error.

The father contends that at the conclusion of the April, 1986 hearing, the District Court said "that [the father] was to be put back with his children after treatment." The court's statement in the record was:

> [I]'m going to review the reports again, and what I'm thinking of right now is ordering [the father] to receive some kind of treatment with the idea of, upon a successful completion of that treatment, to gradually reintroduce him to his family.

This statement does not show the District Court was going to reunite the family. It only shows reunification was a consideration the court would contemplate. The court took the matter under advisement and although the final order was not issued until June 5, 1986, it was properly considered.

The law is clear that in termination hearings, the findings of the court are presumed to be correct and will not be reversed absent a clear abuse of discretion. Matter of Declaring V.B., T.B., D.B. and B.B. Youths in Need of Care. (Mont. 1987), _____ P.2d _____, 44 St.Rep. 1838; Matter of C.P. (Mont. 1986), 717 P.2d 1093, 1095, 43 St.Rep. 728, 730; Matter of C.L.A. (Mont. 1984), 685 P.2d 931, 41 St.Rep. 1444. For termination to occur the court is required to follow the

13

criteria set forth in § 41-3-609, MCA. Matter of Declaring V.B., T.B., D.B. and B.B., Youths in Need of care, supra; Matter of C.A.R., supra.

In this case, the District Court made the following findings of fact: 1. Dr. Krajacich, after over two years of evaluation, stated the youths had related to him that their father had sexually abused them; that the youths' stories over this period of time were consistent; and that the youths could not have been coached. 2. The youths made statements in open court to the effect that the father had sexually abused them. 3. The father continued to deny that he sexually abused R.A.D. and J.D. even though Dr. Russell, who evaluated the father, concluded that he was untruthful, repressed favorable information, and did indeed sexually abuse the youths. 4. The father was unwilling or unable to receive treatment as a sex offender and no party informed the court of any sex offender therapist or treatment program that would be willing to work with him. 5. Because the father had not received any treatment, although he stated he would be willing to receive treatment while contending that he did not need the treatment, the conditions that caused him to be unfit were unlikely to change within the foreseeable future. 6. That continuation of the parent-child relationship would result in continued abuse and neglect and the youth's best interests would be served only if SRS supervised allowed contact.

Section 41-3-609(1), MCA, states:

> The court may order a termination of the parent-child legal relationship upon a finding that the circumstances contained in subsection (1)(a), (1)(b) or (1)(c), as follows, exists: [(1)(a) and (1)(b) do not apply in this case]

14

(c) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

(2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court must enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse and neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care.

The specific findings of the court followed subsections (1)(c)(i) and (c)(ii) and (2) of § 41-3-609, MCA. Despite these findings, the father argues that "[t]here was no substantial credible evidence supporting the District Court's order, when properly scrutinized." Upon scrutiny of the record, we find that the father did not attempt to enter into treatment or have the court approve an appropriate treatment program. He sought out no treatment for two and one-half years. He was evaluated by psychiatrists at court order only. Both Dr. Russell and Dr. Krajacich testified as to the difficulty in getting the father enrolled in treatment. Attempts were made by him to have the SRS pay for his psychological evaluations but similar requests for treatment are not present.

Dr. Krajacich testified that it was "a good prognosis that maybe these boys could get back together with their

15

family" but concluded that he believed the youths were sexually abused. Dr. Russell concluded that the father had sexually abused the youths. Irene Johnson agreed with the conclusion. The District Court's finding of sexual abuse was not clearly erroneous and therefore is upheld.

Termination can occur if a child is "abused and neglected" defined as:

> [a] child whose normal physical or mental health or welfare is <u>harmed</u> or threatened with <u>harm</u> by the acts or omissions of his parent or other person responsible for his welfare. (Emphasis added.)

Section 41-3-102(2), MCA. Harm includes acts when a parent "commits or allows to be committed a sexual abuse against the child . . . " Section 41-3-102(3)(b), MCA. <u>Matter of C.A.R.</u>, supra, 693 P.2d at 1220. The District Court therefore was presented with clear and convincing evidence that the statutory criteria of § 41-3-609, MCA was met and had substantial evidence that shows it did not abuse its discretion in terminating the father's rights on the merits.

The sole issue raised on appeal by counsel for the mother concerns the District Court's failure to grant a continuance for the April, 1986 hearings. Counsel for the mother argues that the District Court had bifurcated the trial as to the mother and the father at the November 22, 1985 hearing and that the trial court attorney for the mother was surprised to learn on April 16, 1986 that she would be required to proceed and represent the mother. It is clear from the record, as previously discussed, that the court did not bifurcate the trial on November 22, 1985. The April 16, 1986 hearing was indeed the hearing "at a later date" to determine the mother's rights.

The District Court granted the mother's counsel three continuances after the November 22, 1985 hearing and prior to

16

the April 16, 1986 hearing. The law in this state is clear that a denial of a motion for continuance is within the sole discretion of the trial judge, In Re Marriage of Robbins (Mont. 1985), 711 P.2d 1347, 42 St.Rep. 1897; Bolich v. Bolich (1982), 199 Mont. 45, 647 P.2d 844. Section 25-4-503, MCA states that the District Court may postpone a trial or hearing in its discretion.

There was testimony from the mother's psychiatrist that she was not responding well to treatment at Warm Springs and her court-ordered commitment could possibly be extended. There was no set date when she would definitely be released. Her counsel also could not assure the District Court when, if at all, the mother would be able to attend.

Courts have held that a continuance may be warranted if a party is mentally incapacitated. Alvis v. Kimbrough (5th Cir. 1972), 455 F.2d 922; Thanos v. Mitchell (1959), 152 A.2d 833. Other courts have held it is not an abuse of discretion for the court to deny a motion for continuance where the petitioner claimed mental illness and there was evidence that it was uncertain as to when he would ever be able to testify. See, Chambers v. Anderson County Dept. of Social Services (S.C. 1984), 311 S.E.2d 746; Williford v. Williford (Ga. 1973), 198 S.E.2d 181. Testimony showed it was uncertain as to whether the mother would ever be able to testify and litigation was entering its second year at the time of the April 16, 1986 hearing.

We find no reversible error under the arguments presented by appellate counsel. We do, however, remand this case. It is expressly stated in Rule 17(c), M.R.Civ.P.:

> [T]he court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of

17

> the infant or incompetent person, or in
> any case where the court deems it
> expedient a guardian ad litem may be
> appointed to represent an infant or
> incompetent person, even though the
> infant or incompetent person may have a
> general guardian and may have appeared
> by him. (Emphasis added.)

From the record we can find no procedure by which the mother had a guardian ad litem named to represent her interests. Further, we can find no appropriate waiver of her rights to appear before the court on this matter pursuant to § 53-21-119(2), MCA which states:

> (2) The right of the respondent to be
> physically present at a hearing may also
> be waived by his attorney and the friend
> of respondent with the concurrence of
> the professional person and the judge
> upon a finding supported by facts that:
>
> (a) the presence of the respondent at
> the hearing would be likely to seriously
> adversely affect his mental condition;
> and (b) an alternative location for the
> hearing in surroundings familiar to the
> respondent would not prevent such
> adverse effects on his mental condition.

This section causes us concern because the act in which it is found seems to deal largely with proceedings to determine involuntary capacity. Nonetheless, a reading of the express purpose of the act, § 53-21-101, MCA, shows the need for protection of the incompetent person's rights:

> The purpose of this part is to: . . . (4)
> assure that due process of law is
> accorded any person coming under the
> provision of this part.

The District Court has an affirmative duty to assure that the rights of a party, who is alleged to be incompetent, are protected. Rule 17(c), M.R.Civ.P. requires appointment

18

of a guardian ad litem for an incompetent person whose rights might be abrogated by a lack of proper representation. State ex rel. Perman v. District Court (Mont. 1984), 690 P.2d 419, 41 St.Rep. 2002.

The parties agree that at the time of entry of the order appealed from, the mother was under an order of commitment and was confined at the Montana State Hospital. It is unclear from the record whether, at the time of the hearing, the mother was adjudicated incompetent. Having had no guardian ad litem appointed for her, and in light of our discussion on the need to consider the constitutionally protected interest in maintaining family integrity, the District Court should have made a determination whether E.D.'s parental rights were adequately protected. The fact that the mother was represented at the hearing by appointed counsel does not meet the requirements of Rule 17(c), M.R.Civ.P., if, in fact, the mother was incompetent.

The termination of the father's parental rights is affirmed. As to the mother's parental rights, this case is remanded to the District Court for determination as to whether, under the unique facts of the case, the rights of E.D. have been properly protected and whether a guardian ad litem is necessary to properly represent E.D. prior to the termination of her parental rights.

_____
Justice

19

We concur:

_____
Chief Justice

_____

_____

_____
Justices