137 P.3d 973

**KELLY R., Appellant,**

v.

**ARIZONA DEPARTMENT OF ECO-
NOMIC SECURITY, Alex R., Alicia
R. and Marcus R., Appellees.**

No. 1 CA–JV 05–0003.

Court of Appeals of Arizona,
Division 1, Department E.

June 27, 2006.

Kathleen M. Mucerino, Sun City, for Appellant.

Terry Goddard, Attorney General, Phoenix, By Stacy L. Shuman, Assistant Attorney General, Mesa, for Appellee, Arizona Department of Economic Security.

Susan Sherwin, Office of the Legal Advocate, By Ginger Jarvis, Deputy Legal Advo-

cate, Phoenix, Guardian Ad Litem for Appellees, Alex R., Alicia R. and Marcus R.

## OPINION

NORRIS, Presiding Judge.

¶ 1 This appeal arises out of an order entered by the juvenile court terminating an adult parent's rights to her biological children. Kelly R. ("Mother") argues the juvenile court was required to appoint a guardian ad litem ("GAL") for her because the Arizona Department of Economic Security ("ADES") sought termination under Arizona Revised Statutes ("A.R.S.") section 8–533(B)(3) (Supp. 2005) ("mental illness, mental deficiency or a history of chronic abuse of dangerous drugs, controlled substances or alcohol"). She also argues the juvenile court abused its discretion in not doing so *sua sponte* because she was "mentally ill." We disagree with both arguments. We hold the parental rights termination statutes do not automatically require the juvenile court to appoint a GAL for a parent when ADES seeks termination under A.R.S. § 8–533(B)(3). We also hold that, because the juvenile court was not provided with reasonable grounds to believe Mother was "mentally incompetent," i.e., that she was unable to understand the nature and object of the proceedings or to assist in her defense, it was not required to appoint a GAL for her. Thus, we affirm the juvenile court's termination of Mother's parental rights.[1]

## FACTS AND PROCEDURAL HISTORY

¶ 2 On May 18, 2003, at 2:00 a.m., Mesa police arrested and jailed Mother for being in a stolen vehicle and possessing drug paraphernalia. Mother, who was pregnant, had five outstanding warrants for her arrest. Marcus, her then-two-year-old son, was in the stolen vehicle with Mother when she was arrested. Child Protective Services ("CPS") took Marcus and placed him in temporary shelter care. The next day, a CPS investigator interviewed Mother at jail; Mother admitted she had crystal methamphetamine in her possession when she was arrested and had been in "detox" the previous week due to a relapse.

¶ 3 ADES filed a dependency petition on May 21, 2003. ADES alleged Mother was unable to parent Marcus due to her incarceration and substance abuse issues. While incarcerated, Mother gave birth prematurely—at 30 weeks—to twins, Alex and Alicia. The twins were taken into temporary physical custody and placed in foster care. Mother was sentenced to three years probation and ten days in jail on the charges; she was released from jail on June 25, 2003 and moved to a halfway house. ADES then filed a supplemental dependency petition, alleging Mother was also unable to parent the twins because of her substance abuse and because she was "destitute."

¶ 4 Mother was appointed counsel, and, with counsel, attended a Preliminary Protective Hearing on July 15, 2003, and submitted to the dependency. Accordingly, the juvenile court found the children dependent as to Mother; made the children temporary wards of the court, committed to the temporary care, custody and control of ADES; and confirmed family reunification as the case plan.

¶ 5 During the next eight months, Mother successfully participated in family reunification services. One of the services Mother completed was a psychological evaluation by psychologist, Daniel Juliano, Ph.D. in July 2003. In his evaluation, Dr. Juliano stated Mother's reading skills were at an eighth grade level and "well within the range necessary to be able to participate and comply with personality tests and inventories." He also noted Mother "did not present with evidence suggesting mental deficiency or significant learning disabilities."

¶ 6 Dr. Juliano further reported Mother "was highly anxious, probably manic, with attention deficit disorder at least evident." He found Mother had "a striking lack of insight" in recognizing her problems and owning up to them. Dr. Juliano concluded Mother was "not exhibiting full understand-

---

1. In a separate memorandum decision, *Kelly R. v. Ariz. Dep't of Econ. Sec.*, 1 CA–JV 05–0003 (Ariz.App. June 27, 2006) (mem.decision), filed simultaneously with this opinion, *see* Ariz. R. Sup.Ct. 111 and ARCAP 28, we reject Mother's remaining arguments.

ing of her present reality," likely had a "very significant mood disorder" and "appeared to have significant mental health needs, with substance abuse problems and dependency also quite evident." Dr. Juliano's diagnostic impressions included poly-substance abuse, methamphetamine dependence, mood disorder NOS and a personality disorder NOS with narcissistic and anti-social features.

¶ 7 Mother continued with the case plan. She participated in a substance abuse program, worked with a parent aide and obtained a job. Because of Mother's compliance with the case plan, in March 2004, ADES filed an uncontested motion to place Marcus in Mother's physical custody. ADES advised the court Mother had found daycare for Marcus and had moved into a two-bedroom apartment. It also reported that a family reunification team had accepted Mother's case and agreed to monitor the family for the next three months. By order entered on March 19, the court placed Marcus in Mother's physical custody. The twins remained in foster care.

¶ 8 On March 24, Mother met with the family reunification team, but then canceled the next three reunification team meetings. She also ignored notes requesting contact left at her apartment by CPS, the family reunification team and the children's GAL, and stopped participating in drug tests. Consequently, on April 13, 2004, ADES moved to regain physical custody of Marcus. The court granted its motion and CPS retrieved Marcus at Mother's apartment. Mother told CPS she had received the notes left for her, but had not contacted CPS because of warrants for her arrest for probation violations. The police eventually arrested Mother and Marcus returned to ADES's physical custody.

¶ 9 Mother attended a Permanency Planning Hearing concerning Marcus on April 28, 2004. Mother and her attorney acknowledged Mother had made mistakes. Mother admitted she had relapsed: "I did relapse but I still love my kids." Through counsel, Mother emphasized, however, she wanted to "get back on track" and regain custody of her children. Mother explained she had obtained a new job and asserted she was committed to participating in services: "Whatever you want me to do, I will do it." Mother asked the court to repeat which services it wanted her to participate in, so "[t]hat way I can do it."

¶ 10 The court ordered Mother to attend and participate in another psychological evaluation on May 30 with Dr. Juliano—denying her request to be evaluated by a different psychologist—and ordered her to participate in hair follicle/urinalysis testing, TERROS, and Families F.I.R.S.T. services. The case plan remained family reunification, although the court warned Mother that, at the next hearing, "we will be making a decision whether or not your case plan for family reunification with your children should continue or whether it should be changed and it will be asked as to all three children." The court told Mother its decision would depend on whether she complied with the court's requirements.

¶ 11 Mother did not follow through with her promises to participate in the services ordered by the court. As detailed in the CPS case manager's June 8, 2004 report, after the Permanency Planning Hearing, Mother did "almost nothing on her case plan goals."

¶ 12 At the next Permanency Planning Hearing on June 16, Mother was not present, although she had attempted to contact her attorney about the hearing. After considering the CPS case manager's report, the court found Mother's relapse was "not minor," determined further reunification services were no longer appropriate, and approved a change in the case plan from family reunification to severance and adoption. The court directed ADES to file a motion to terminate Mother's parental rights.

¶ 13 ADES moved to terminate Mother's parental relationship with the children under A.R.S. § 8–533(B)(3). That section authorizes termination of parental rights if

the parent is unable to discharge the parental responsibilities because of mental illness, mental deficiency or a history of chronic abuse of dangerous drugs, controlled substances or alcohol and there are reasonable grounds to believe that the con-

dition will continue for a prolonged indeterminate period.

¶ 14 Mother did not appear at the initial severance hearing on July 21, 2004 because she was in jail. Her attorney, however, advised the court Mother intended to contest the termination.

¶ 15 Subsequently, Mother invoked her right to a jury trial. Mother's counsel advised the court at an August 4, 2004 report and review hearing that Mother had "informed me that she wishes to invoke her right to have a jury trial on severance." Mother also filed with the court a handwritten and signed request for a jury trial. At a September 13 pretrial conference Mother attended, the court scheduled the jury trial for December 14–17, 2004 and another pretrial conference for November 12, 2004.

¶ 16 On September 15, 2004, Mother finally attended the court-ordered psychological evaluation with Dr. Juliano. During the evaluation, Mother acknowledged she had "relapsed," and appeared manic, hyperactive and impulsive. As before, Dr. Juliano found no evidence suggesting mental deficiency or significant learning disabilities. And, as before, Dr. Juliano found evidence of chronic substance abuse, a prominent mood disorder and an underlying personality disorder. His diagnostic impression remained essentially the same.

¶ 17 Mother failed to attend the November 12 pretrial conference. The court found Mother had been given adequate notice of the hearing and warned of the consequences if she failed to appear, including entry of a default and termination of her parental rights. Finding "no good cause" for her nonappearance, the court granted ADES's request to proceed with termination by default. Two CPS case managers then testified. Based on their testimony and after reviewing

the case file, the court terminated Mother's parental rights to the children, finding ADES had proven by clear and convincing evidence the grounds for termination under A.R.S. § 8–533(B)(3) and that termination of Mother's parental rights was in the best interests of the children.

¶ 18 Mother appealed the termination order. We have jurisdiction pursuant to A.R.S. § 8–235(A) (Supp.2005).

## DISCUSSION

¶ 19 Mother did not ask the juvenile court to appoint a GAL for her.[2] Nevertheless, on appeal, she argues the juvenile court should have *sua sponte* appointed a GAL for her because first, ADES moved for termination under A.R.S. § 8–533(B)(3), *see supra* ¶ 13, and, second, she was, in fact, "mentally ill." Mother asserts a GAL would have protected her interests and could have ensured her attendance at court hearings, including the November 12 pretrial conference; her compliance with reunification services; and her reunification with Marcus when she was able to take care of him.

¶ 20 Under the parental rights termination statutes, the juvenile court must appoint a GAL for a parent if "it determines that there are reasonable grounds to believe that [the parent] is mentally incompetent ...." A.R.S. § 8–535(F) (Supp.2005).[3] Section 8–535(F) requires the court to make the appointment when reasonable grounds exist, whether the motion is made by "any party," or "on its own motion."[4] Further, Juvenile Court Rule of Procedure 40(C) states that if the court has "reason to believe a parent ... may be incompetent, the court shall appoint a guardian ad litem," who will then "conduct an investigation and report to the court as to whether the parent ... may be incompetent and in need of protection." The rule author-

---

2. A GAL is "a person appointed by the court to protect the interest of a minor or an incompetent in a particular case before the court." A.R.S. § 8–531(7) (Supp.2005).

3. A.R.S. § 8–535 was recently amended by S.B. 1415, 47th Leg., 2d Reg. Sess. (Ariz.2005) which was approved by Governor Janet Napolitano on April 6, 2006. This amendment does not change the statute as it is relevant to this opinion.

4. A.R.S. § 8–535(F) states in full: "On the motion of any party or on its own motion, the court shall appoint a guardian ad litem if it determines that there are reasonable grounds to believe that a party to the proceeding is mentally incompetent or is otherwise in need of a guardian ad litem."

izes and requires the court to conduct hearings and enter orders "as determined to be necessary to protect the interests of the parent."

¶ 21 Mother's first argument, that because the State sought termination under A.R.S. § 8–533(B)(3) the court was required to appoint a GAL, is without merit.[5] Before 1990, the statutes required the juvenile court to appoint a GAL for a parent when the basis for termination was, as here, § 8–533(B)(3). A.R.S. § 8–535(D) (1989) ("When the termination of the parent-child relationship is sought under § 8–533, subsection B, paragraph 3, the court shall appoint a guardian ad litem for the alleged incompetent parent."); *Appeal in Gila County Juv. Action No. J-3824*, 130 Ariz. 530, 531–32, 637 P.2d 740, 741–42 (1981), *vacated on other grounds by Appeal in Pima County Juv. Action No. S-919*, 132 Ariz. 377, 377, 646 P.2d 262, 262 (1982); *Appeal in Pima County Juv. Action No. S-828*, 135 Ariz. 181, 183, 659 P.2d 1326, 1328 (App.1982).

¶ 22 However, in 1990, the legislature amended § 8–535(D) and removed the mandatory appointment language when termination is sought under § 8–533(B)(3). 1990 Ariz. Sess. Laws, ch. 11, § 1. Thus, for the past 16 years, when the State moves to terminate under § 8–533(B)(3), the juvenile court is no longer automatically required to appoint a GAL for the parent.

¶ 23 This construction of the statute is confirmed by its legislative history. Speaking to a House Committee on the amendment to § 8–535 proposed in 1990, the Honorable James McDougall, then a juvenile court judge, "advised the Committee that this legislation provides for the appointment of a guardian ad litem, if it is determined necessary, and that such appointment will no longer be automatic in a parental termination proceeding." *Minutes of the Arizona House of Representatives Committee on Human*

*Resources and Aging on H.B. 2355*, 39th Leg., 2d Reg. Sess. at 3 (Feb. 8, 1990). Judge McDougall further testified "it had been [the juvenile court judges'] experience that *typically* that person really does not need a guardian ad litem and the alleged disorder is sufficient to terminate parental rights, but not enough to cause the person to be declared incompetent." *Minutes of the Arizona State Senate Committee on Judiciary on H.B. 2355*, 39th Leg., 2d Reg. Sess. at 3 (Mar. 13, 1990) (emphasis added). As we discuss below, Mother's case aptly fits this described "typical" situation.

¶ 24 Mother next contends that, even if she was not automatically entitled to a GAL because the State sought termination under A.R.S. § 8–533(B)(3), the court should have *sua sponte* appointed a GAL because it was presented with evidence she was "mentally ill."[6]

¶ 25 Mother's psychological evaluations revealed she suffered from various mental illnesses. *See supra* ¶¶ 6, 16. However, contrary to Mother's suggestion, being "mentally ill" and being "mentally incompetent" are not the same[7]; as we discuss below, "mentally incompetent" is a distinct legal concept. A mentally ill parent is not necessarily a mentally incompetent parent. *See* A.R.S. § 13–4501(2) (2001) ("The presence of a mental illness, defect or disability alone is not grounds for finding a defendant incompetent to stand trial."); *Swisher v. United States*, 237 F.Supp. 921, 936 (W.D.Mo.1965) (" 'a diagnosis of mental illness, standing alone, is not, under any accepted standard, tantamount to mental incapacity to stand trial' ") (citation omitted); *Doe I. v. Doe*, 138 Idaho 893, 71 P.3d 1040, 1052 (2003) ("parent may have a mental illness or deficiency and still be competent for purposes of the proceeding such that a guardian ad litem is not necessary"). Importantly, A.R.S. § 8–535(F) and Juvenile

---

5. This argument presents a legal issue which we review de novo. *See Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 9, 83 P.3d 43, 47 (App.2004).

6. We review the juvenile court's failure to *sua sponte* appoint a GAL under an abuse of discretion standard. *See United States v. 30.64 Acres of*

*Land*, 795 F.2d 796, 804 (9th Cir.1986); *People in Interest of M.M.*, 726 P.2d 1108, 1120 (Colo. 1986).

7. In her opening brief, Mother uses "mentally ill" and "mentally incompetent" interchangeably.

Court Rule of Procedure 40 do not obligate the court to appoint a GAL for a parent when there are reasonable grounds to believe the parent is mentally ill or has a mental illness; rather, the statute and the rule use the phrase mentally "incompetent." Therefore, the issue we must decide in this case is whether the juvenile court was presented with reasonable grounds to believe Mother was *mentally incompetent.*

¶ 26 Neither the parental rights termination statutes nor the juvenile court procedural rules define the phrase "mentally incompetent." However, the meaning of mentally incompetent has become well-developed in the context of the criminal law.

> It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense, may not be subjected to trial.

*Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *see also Medina v. California,* 505 U.S. 437, 440, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992).

¶ 27 In deciding whether to appoint a GAL for an allegedly mentally incompetent parent in a child dependency or parental termination case, courts from other jurisdictions have applied the criminal law definition of mentally incompetent. *In re Christina B.,* 19 Cal. App.4th 1441, 1448–50, 23 Cal.Rptr.2d 918 (Cal.Ct.App.1993); *In re Alexander V.,* 223 Conn. 557, 613 A.2d 780, 783 n. 4 (1992); *see also In re D.A.,* 239 Neb. 264, 475 N.W.2d 511, 513 (1991); *In re C.L.,* 143 Vt. 554, 468 A.2d 563, 565 (1983). These courts, directly or implicitly, have recognized that, like a criminal trial in which a defendant faces imprisonment and the deprivation of a fundamental right, his or her liberty, a proceeding to terminate parental rights threatens a parent's fundamental liberty interest in the care, custody and management of his or her children. *Kent K. v. Bobby M.,* 210 Ariz. 279,

284, ¶ 24, 110 P.3d 1013, 1018 (2005) (stating parents possess fundamental liberty interest in care, custody and management of their children); *Monica C. v. Ariz. Dep't of Econ. Sec.,* 211 Ariz. 89, 92, ¶ 16, 118 P.3d 37, 40 (App.2005) (same). "When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *Santosky v. Kramer,* 455 U.S. 745, 753–54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

■ ¶ 28 Thus, we follow suit and hold that, under A.R.S. § 8–535(F), the essential question in deciding if reasonable grounds exist to believe a parent is mentally incompetent is whether the parent is unable to understand the nature and object of the proceedings or assist in his or her defense.[8] *Alexander V.,* 613 A.2d at 784 ("By definition, a mentally incompetent person is one who is unable to understand the nature of the termination proceeding and unable to assist in the presentation of his or her case."); *Adoption of Kirk,* 35 Mass.App.Ct. 533, 623 N.E.2d 492, 495 (1993) (same); *see also* Sherry S. Zimmerman, Annotation, *Parents' Mental Illness or Mental Deficiency as Ground for Termination of Parental Rights—Issues Concerning Guardian Ad Litem and Counsel,* 118 A.L.R. 5th 561 (2004) (whether "parents are capable of understanding the nature of proceedings dealing with the issue of termination of their parental rights and are able to help their attorneys prepare a defense on their behalf"). This interpretation of A.R.S. § 8–535(F) is, we also note, consistent with the definition of incompetency to stand trial under our criminal statutes. *See* A.R.S. § 13–4501(2) (" 'Incompetent to stand trial' means that as a result of a mental illness, defect or disability a defendant is unable to understand the nature and object of the proceeding *or* to assist in the defendant's defense.") (emphasis added).

¶ 29 Here, the court was presented with ample evidence Mother was mentally ill, but no evidence she was mentally incompetent.

---

8. This case involves an adult parent; and, we limit our holding to cases involving adult parents. For juvenile parents, the meaning of mentally incompetent may be different. *Cf.* A.R.S. § 8–291(2) (Supp.2005) (amended by S.B. 1128, 47th Leg., 2d Reg. Sess. (Ariz.2005)); *In re Hyrum H.,* 212 Ariz. 328, 332, ¶¶ 21–22, 131 P.3d 1058, 1062 (App.2006). We need not decide this question, however, as it is not properly before us.

The record reflects Mother was able to understand the nature and object of the proceedings and assist in her defense by making decisions on how the case should proceed, consulting with her counsel, and speaking on her own behalf in court. *See M.M.*, 726 P.2d at 1120–21. Accordingly, because reasonable grounds did not exist to believe Mother was mentally incompetent, the court was not required by statute or rule to appoint a GAL. Therefore, the court did not abuse its discretion in not doing so.

¶ 30 Early in the case, Mother decided against challenging and, instead, submitted to the dependency because, as it appears from the record, she understood she would need help to regain custody of her children. Indeed, Mother attended several court hearings and successfully participated in reunification services, which resulted in Marcus being placed in her physical custody. After her relapse, Mother attended the Permanency Planning Hearing on April 28, 2004, and directly advocated for herself throughout that hearing. *See supra* ¶¶ 9–10.

¶ 31 After the case plan changed from family reunification to severance and adoption, Mother made the decision to contest severance. She spoke directly with her counsel and informed her she wanted a jury trial. In addition, Mother submitted to the court a handwritten, signed request for a jury trial. While Dr. Juliano's reports detailed Mother's mental illnesses, he never concluded, or even suggested, she was mentally incompetent. *See State v. Amaya–Ruiz*, 166 Ariz. 152, 163, 800 P.2d 1260, 1271 (1990) (quoting *Drope*, 420 U.S. at 180, 95 S.Ct. 896) (any prior medical opinion on competence to stand trial relevant). Moreover, Mother was never hospitalized or committed due to her diagnosed illnesses, *see In re R.A.D.*, 231 Mont. 143, 753 P.2d 862, 870 (1988), and Mother's attorney did not raise any issue regarding Mother's competency. *See Alexander V.*, 613 A.2d at 786.

¶ 32 The juvenile court, as opposed to this court, is in the best position to determine a parent's mental competency to participate in a termination proceeding because it sees and hears from the parent at "live" hearings. *See In re Pima County Dependency Action No. 93511*, 154 Ariz. 543, 546, 744 P.2d 455, 458 (App.1987); *M.M.*, 726 P.2d at 1121. Apparently, the court did not observe any behavior that would have raised a concern about Mother's mental competency. *See Kirk*, 623 N.E.2d at 495 (no "bizarre" behavior), and, *cf. M.M.*, 726 P.2d at 1120 (parent's testimony was "articulate, precise, and quite responsive to each question").

¶ 33 Thus, despite Mother's diagnosed mental illnesses, there simply is no indication in the record Mother was unable to understand the nature and object of the proceedings or assist in her defense. The juvenile court was not presented with reasonable grounds to believe Mother was mentally incompetent. Consequently, A.R.S. § 8–535(F) [9] did not require the juvenile court to *sua sponte* appoint Mother a GAL.

¶ 34 Finally, Mother argues "due process" required the juvenile court to appoint a GAL for her. Mother has not cited and we have not found any authority holding due process requires a juvenile court in a parental rights termination case to appoint a GAL for a parent, like Mother, who is mentally ill, but not mentally incompetent. On the record presented here, Mother's due process claim fails.

## CONCLUSION

¶ 35 For the foregoing reasons, we affirm the juvenile court's termination of Mother's parental rights to her biological children.

PHILIP HALL and JON W. THOMPSON, JJ., concur.

---

9. Mother has not argued she was "otherwise in need of a guardian ad litem" and entitled to a GAL under that provision of § 8–535(F). *See* *supra* note 4. Therefore, we do not construe that provision here.