473 S.E.2d 110

**In the Matter of LINDSEY C.**

No. 23065.

Supreme Court of Appeals
of West Virginia.

Submitted Oct. 31, 1995.

Decided Dec. 14, 1995.

Dissenting Opinion of Justice
Workman July 19, 1996.

Mary Lee Moore Bizanovich, Wheeling, Guardian ad Litem for Lindsey C.

Scott R. Smith, Assistant Prosecuting Attorney, Ohio County, Wheeling, for Appellee, West Virginia Department of Health and Human Resources.

Kristin Sacco, First Judicial Circuit Public Defender Corp., Wheeling, for Appellee Zachary P.C.

Nan G. Brown, West Virginia Legal Services, Wheeling, and Michael Miskoviec, West Virginia Legal Services, Charleston, for Appellant Terri C.

ALBRIGHT, Justice:

This is an appeal of a juvenile abuse and neglect case conducted under the authority of W.Va.Code § 49-1-1, *et seq.* Appellant, Terri C., the natural mother of the infant, Lindsey C., born June 1, 1992, now appeals an order entered March 1, 1995, terminating her parental rights after a hearing held by the Circuit Court of Ohio County, West Virginia, February 1, 1995. Appellant argues that the lower court erred in failing to appoint counsel for her in the proceedings below and in terminating her parental rights without properly serving her with copies of the original petition and proper notice. The only appearances noted for appellant in the proceedings below are by letter dated April 17, 1995, filed below May 26, 1995, authorizing appellant's counsel here to investigate the file, and by the filing of this appeal in the circuit clerk's office, June 30, 1995.

A recitation of the factual and procedural history of the case is necessary before we discuss the law as it applies in this instance.

In January, 1992, appellant was committed to a mental hospital in Pennsylvania from which she was released June 8, 1992, following the birth of Lindsey C., June 1, 1992. The discharge summary for that hospitalization, a copy of which was filed in the court record in this proceeding August 24, 1994, discloses that appellant was suffering from a

serious mental disorder, controllable at least in part by medication but complicated by "a chronic history of noncompliance with after care treatment and additional stress of bringing up a newborn child". She was discharged to return to West Virginia and, according to the discharge summary, "the Base Service Unit in West Virginia was informed as well as Children and Youth Services...."

In March, 1993, appellant was admitted to Weston State Hospital in West Virginia for psychiatric problems. She remained hospitalized approximately thirty days, during which time her child, Lindsey C., stayed in the actual custody of her father, Zachary C., to whom appellant was married. After appellant's return from Weston she apparently resided in an apartment in Wheeling with her husband. In May of 1993, appellant filed a domestic violence petition against her husband, Zachary C., and an Ohio County magistrate awarded appellant temporary custody of Lindsey C., after which it appears that appellant and her husband did not reside together.

In August, 1993, the Department of Health & Human Resources (hereafter "DHHR" or "the Department") received a referral regarding suspected neglect of Lindsey C. by appellant. According to a DHHR Court Summary dated May 6, 1994, within two days of that referral appellant was again committed to Weston State Hospital. Lindsey C. was delivered into the actual custody of her father, Zachary C., who then apparently occupied the apartment vacated by appellant incident to her hospitalization, probably the apartment from which the child was later removed. The record does not disclose whether any action was taken at that time to vest or confirm legal custody of Lindsey C. in Zachary C. incident to the transfer to him of her actual custody. The record does not disclose any further orders regarding the legal custody of Lindsey C. except those entered in this proceeding, later described. The DHHR commenced a series of visitations to the father's apartment. After several such visits, the DHHR was satisfied with the circumstances in which Zachary C. was maintaining the child and ceased visitations and all other child protective services. During this time, while hospitalized at Weston, Terri C. claimed that Zachary C. had sexually abused their child, but the DHHR found those allegations to be without merit and took no other action with respect to such allegations.

The DHHR Court Summary previously mentioned states that at approximately 9:00 p.m. on Thursday, April 21, 1994, Wheeling police officers received a report that Zachary C. had been seen intoxicated on the street near his residence with Lindsey C. in his custody. Police officers found Lindsey C. in her father's apartment at about 9:55 p.m. that same evening. She was unharmed and with her father, who was said to be drunk and unconscious. The police immediately took Lindsey C. to the home of an acquaintance of her father. According to the summary, Lindsey C.'s father was expected to pick her up from the home of the acquaintance about 5:00 p.m. the next day and had commented that he soon planned to take Lindsey C. to live in Kansas. The DHHR believed the child had been in a dangerous situation in her father's apartment and faced imminent danger if returned to his custody, so the DHHR decided to take immediate custody of Lindsey C. At about 3:30 p.m. that next day, Friday, April 22, 1994, Wheeling police officers removed the child from the home of her father's acquaintance and delivered her to a DHHR child protective service worker, who then placed her in a foster home licensed by the DHHR. The record is silent as to the whereabouts of appellant at that time except that the DHHR Court Summary of May 6, 1994, reports that the nearest relative then known who might have been able to take custody of Lindsey C. was M.B., the maternal grandmother, who lived over one hundred miles away in another state.

On Friday, April 29, 1994, the Circuit Court of Ohio County entered an order, styled an order *nunc pro tunc* as of Tuesday, April 26, 1994, awarding temporary emergency custody of Lindsey C. to the DHHR. This emergency order recites that on Monday, April 25, 1994, the DHHR filed a petition requesting ratification of emergency custody of the child, Lindsey C., because the parents, Zachary C. and Terri C., the appellant, had

neglected and abused the child. Specifically, the petition alleged that appellant abused and neglected the child by abandoning her.

The DHHR petition, which apparently was actually filed Friday, April 29, 1994,[1] asked the court, *inter alia*, to ratify removal of the child from her parents' custody and place the child in the custody of the DHHR and, ultimately, to terminate the parental rights of both parents.

In the *nunc pro tunc* order entered Friday, April 29, 1994, the circuit court set a hearing for May 6, 1994, and appointed counsel for the child and the father. The order states that an attorney for the mother/appellant "shall be selected later". The order does not address the issue of appointment of a guardian ad litem for appellant nor does it address the service of process on appellant.

The order reflecting the action of the court May 6, 1994, shows that the court took no action regarding service of notice on appellant or appointment of counsel or a guardian ad litem for appellant.

On May 9, 1994, an attested copy of the emergency order and the abuse and neglect petition was sent by certified mail to appellant. The address used for that mailing was that of M.B., the maternal grandmother of Lindsey C., who had earlier been identified for the court below as the "closest known relative" able to take custody of Lindsey C. The petition and order were not successfully delivered as addressed; they were forwarded to a Wheeling address, apparently the address from which the child had been taken by the State, and was returned by the postal service to the circuit clerk May ?, 1994,[2] marked "moved, left no address, return to sender".

On May 23, 1994, the court ordered a home study to evaluate the suitability of the home of M.B., the maternal grandmother, who had expressed interest in receiving temporary custody of Lindsey C. The address for this home study was the same as that to which the copy of the petition and emergency order, addressed to appellant, had been previously, unsuccessfully mailed.

1. The petition reflects that it was verified Tuesday, April 26, 1994 and "filed" Friday, April 29, 1994. The petition, *inter alia*, seeks court ratification of the non-judicial removal of the child from her parents' custody pursuant to W.Va. Code § 49-6-3(c), the Code section cited in the emergency temporary order. The pertinent portion of that Code section provides:

If a child or children shall, in the presence of a child protective service worker of the division of human services, be in an emergency situation which constitutes an imminent danger to the physical well-being of the child or children, as that phrase is defined in section three [§ 49-1-3], article one of this chapter, and if such worker has probable cause to believe that the child or children will suffer additional child abuse or neglect or will be removed from the county before a petition can be filed and temporary custody can be ordered, the worker may, prior to the filing of a petition, take the child or children into his or her custody without a court order: Provided, That after taking custody of such child or children prior to the filing of a petition, the worker shall forthwith appear before a circuit judge or a juvenile referee of the county wherein custody was taken, or if no such judge or referee be available, before a circuit judge or a juvenile referee of an adjoining county, and shall immediately apply for an order ratifying the emergency custody of the child pending the filing of a petition.... The parents, guardians or custodians of the child or children may be present at the time and place of application for an

order ratifying custody, and if at the time the child or children are taken into custody by the worker, the worker knows which judge or referee is to receive the application, the worker shall so inform the parents, guardians or custodians.... Upon such sworn testimony or other evidence as the judge or referee deems sufficient, the judge or referee may order the emergency taking by the worker to be ratified.... If the emergency taking is ratified by the judge or referee, emergency custody of the child or children shall be vested in the state department until the expiration of the next two judicial days, at which time any such child taken into emergency custody shall be returned to the custody of his or her parent, guardian or custodian unless a petition has been filed and custody of the child has been transferred under the provisions of section three [§ 49-6-3] of this article.

Careful observance of the provisions of section 3(c) and, in other emergency situations, careful observance of the provisions of W. Va.Code § 49-6-9, authorizing emergency custody by law enforcement officers, is to be encouraged and expected. The apparent intent of these Code sections is to afford protection to the child, the parents, child protective service workers, law-enforcement officers and their respective employers from the potentially serious effects of restraining liberty without due process of law.

2. The date on the copy of the return included in the record is not legible.

The home study for M.B. and her husband was completed about June 10, 1994, and the court below held another hearing on June 28, 1994. An order for that day recites that the court received information concerning the whereabouts of appellant, but no further action was taken to appoint a guardian ad litem or counsel for her or to serve process on her by any means. Further proceedings on July 11 and August 4, 1994, did not deal with appellant other than to note her absence. On August 4, 1994, the court was advised that the sister and brother-in-law of the father, Zachary C., were interested in obtaining custody of Lindsey C. The court ordered a child protective service worker to undertake a thorough investigation of their suitability to receive custody of Lindsey C.

Meanwhile, in Minnesota, a petition was filed against appellant on June 6, 1994, seeking her commitment by judicial order to a mental institution. A hearing on the petition was held on June 23, 1994, at which time appellant was represented by Minnesota counsel. An order entered on that date by the District Court, Seventh Judicial District, in Clay County, Minnesota, stated that there was clear and convincing evidence appellant was mentally ill and, although she did not represent a danger to others, she did represent a danger to herself. Appellant was involuntarily committed at a Fergus Falls, Minnesota, mental institution for an initial period of up to six months.

In West Virginia, the court and the DHHR were aware of appellant's hospitalization by August 19, 1994. A paper filed that day, but dated August 16, 1994, contains the following notations regarding appellant: "mother ... need attorney appointed for her ... mental institution—Minn.... per [name of child protective service worker] ... need to notice...." This paper includes the address of the mental institution and the name and phone number of a social worker there as well as an emergency phone number.

Another hearing in the abuse and neglect case was held in Ohio County on August 22, 1994, and the order for that day recites that the child protective service worker had located appellant in Minnesota and given information regarding her whereabouts to the "pros-ecutor's office". The order also recited that the court received a report of a home study for the sister and brother-in-law of Zachary C. as a potential home for Lindsey C. and required that the comments of the child's guardian ad litem be provided the court "at the next Abuse and Neglect Docket Day".

On August 25, 1994, a postal return receipt for certified mail was included in the court file. This receipt showed that a mailing addressed to appellant at the mental institution previously noted in the file was accepted on August 22, 1994, by a person whose signature is not legible. Appellant claims that no such mailing was ever delivered to her. This mailing is presumably evidence of the State's second attempt to serve appellant by mail with a copy of the petition and other process essential to the commencement of an action charging her with abuse and neglect of Lindsey C. It is noted that the court below also received at that time the copy of the discharge summary describing appellant's Pennsylvania hospitalization in 1992 and had before it the diagnosis of serious mental disorder contained in that summary.

It appears that no further proceedings were had until October, 1994. Two orders reflecting a hearing held on October 11, 1994, noted again that appellant did not appear "in person or by counsel". At that time, the Court ordered certain actions preparatory to awarding custody of Lindsey C. to the sister and brother-in-law of Zachary C., formally appointed them "guardians" of Lindsey C. and ordered that efforts be made to effect delivery of the child to them at their home in a distant state. One of the orders for that day reflects that the court made the following findings with respect to appellant:

5. [Appellant] has abandoned and continues to abandon Lindsey [C.].

6. [Appellant] has neglected Lindsey [C.].

\* \* \* \* \* \*

8. [Appellant] is presently unwilling or unable to provide adequately for the needs of Lindsey [C.].

9. [Appellant] has received actual notice of these proceedings.

10. That continuation in the home is contrary to the best interests and welfare of the infant based upon the neglect by [Zachary C.] and the neglect and abandonment by [appellant].

11. That the West Virginia Department of Health and Human Resources made a reasonable effort to prevent placement of Lindsey outside her home given the neglect and abandonment by [appellant] and [Zachary C.'s] unwillingness or inability to provide supervision and care of Lindsey.

12. That the neglect and abandonment by [appellant] and [Zachary C.'s] unwillingness or inability to provide supervision and care of Lindsey make such efforts unreasonable.

It does not appear from the orders that any sworn testimony was heard that day, October 11, 1994. In any event, we cannot discern from the record before us what reliable evidence was adduced to support these findings.

At an October 30, 1994 hearing, after again noting the absence of appellant, the lower court ordered Lindsey C. delivered to her new guardians. The court also formally received the home study report on the new guardians at a hearing on December 12, 1994, at which time the court again noted appellant did not appear in person or by counsel.

A hearing was held on December 21, 1994, in Minnesota. The court there received a written report from the treatment facility where appellant was incident to the possible termination of her initial commitment there. Appellant was recommitted until March 21, 1995, and transferred to a group home in Little Falls, Minnesota. It appears that appellant remained there in state custody until her release on April 24, 1995.

At a January 13, 1995 hearing in the Circuit Court of Ohio County, a protective service case worker told the court for what appears to be the first time "that [appellant] had made inquiries about Lindsey". On that day, the guardian ad litem for Lindsey C. served a motion, noticed for hearing February 1, 1995, requesting that the court appoint a guardian ad litem for appellant "whose whereabouts are now known and thereafter to address the issue of disposition as to the parental rights of [appellant] in consideration of the court's findings at the October 11, 1995[sic]" hearing that "appellant had abandoned, neglected and was then unwilling or unable to care for" Lindsey C. and for other relief. A copy of the motion and notice of a February 1, 1995, hearing were apparently sent to appellant by certified mail, addressed to the group home in Minnesota.

A West Virginia protective service worker telephoned the Minnesota group home on January 18, 1995, and left a message with a staff member that if appellant wanted to appear in court, she must come to West Virginia. The West Virginia child protective service worker also spoke by telephone to appellant's caseworker in Minnesota on January 31, 1995. The protective service worker was told that appellant was court-ordered to remain at the group home for at least two more months and that appellant was required to make another court appearance in Minnesota before she could be released.

The order for the proceedings of February 1, 1995, is dated March 1, 1995, and is the order from which this appeal is taken. The order notes again that appellant did not appear in person or by counsel. It recites that the court considered the motion of the child's guardian ad litem that a guardian ad litem be appointed for appellant but reflects no action on that motion. The order further states that the court was "advised" by the assistant prosecuting attorney present that the State mailed a copy of the abuse and neglect petition to appellant. The order fails to state whether the court took any sworn testimony. It does recite that the court heard "representations" by, and received a report from, a child protective service worker and did find that appellant "received NOTICE of these proceedings and her right to be represented by counsel in these proceedings". The court then made findings necessary to termination of appellant's parental rights and ordered the DHHR to file a "permanency plan".

On February 21, 1995, at the direction of the circuit court judge, a letter addressed to the judge, dated February 17, 1995, was

filed. It was signed by a new child protective service worker in the case, and related that on February 14, 1995, the assistant director of the group home to which appellant had been committed in Minnesota had spoken to the worker, questioning the termination of appellant's parental rights and reporting that appellant had "received no notification to seek legal representation". The group home director further advised that he intended to advocate strongly in favor of appellant, "in terms of appealing".

At a March 1, 1995 hearing, which again does not note the taking of any sworn testimony, appellant was "enjoined from contacting, harassing or interfering, either directly or indirectly, with Lindsey" or the new guardians. The order further noted that appellant's appeal time would expire four months after the March 1, 1995 date of the order terminating the parental rights of appellant and directs that a copy of the order be sent to appellant at the group home. The court file contains a postal return receipt, signed by "Rita Werner" on March 13, 1995, for mail addressed to appellant at the group home.

By letter dated March 14, 1995, ordered filed by the circuit judge and actually filed in Ohio County on March 20, 1995, appellant's counsel in her Minnesota commitment proceedings advised that appellant had been further committed to involuntary hospitalization for a period of up to twelve months from December 21, 1994. In the same letter appellant's Minnesota counsel stated that neither he nor appellant had been aware of the West Virginia proceedings. He stated that appellant had anticipated reunification with her daughter "in some fashion" and had been "unable to effectively assert her wishes" until shortly before his letter. The letter was concluded with a request that counsel be appointed in West Virginia to "raise the appropriate issues".

Meanwhile, in Minnesota appellant was again alleged to be mentally ill in a petition for judicial commitment filed on March 15, 1995. A hearing was held on March 23, 1995, to determine whether it was necessary to have appellant involuntarily hospitalized until the judicial commitment hearing, and it was determined that she would be hospitalized at the White Shell Facility, Little Falls, Minnesota. A final hearing was held on April 13, 1995, and in an order entered April 25, 1995, the District Court in Minnesota found the state failed to meet its burden and prove by clear and convincing evidence that appellant was mentally ill. Thus, she was released from state custody.

As noted, by letter dated April 17, 1995, and filed with the Circuit Court of Ohio County May 26, 1995, appellant authorized her present counsel to investigate her case, and the present appeal was filed with the circuit clerk of Ohio County, June 30, 1995.

Appellant now argues that the circuit court erred as a matter of law in failing to appoint counsel in this abuse and neglect proceeding and erred in proceeding against her when she had not been served properly with the abuse and neglect petition and notices of hearings. More specifically, appellant argues that an indigent parent must be appointed counsel in a parental rights termination action and that a parent cannot be divested of parental rights if that parent has not been afforded proper notice. The appellees, Zachary C. and the Department of Health and Human Resources, have filed briefs in opposition, as has the guardian ad litem for the child, Lindsey C. In addition, by a cross assignment of error, the Department of Health and Human Resources contends that appellant violated Rule 60(b), Rules of Civil Procedure, by failing to move the trial court for relief prior to filing the appeal and violated the Rules of Appellate Procedure by failing to order transcripts of the hearings below and by failing to serve opposing counsel with a copy of the petition of appeal. Appellee DHHR asks therefore that the appeal be dismissed as improvidently granted.

 Any failure by litigants to observe carefully the requirements of our appellate rules is expressly disapproved; in appropriate circumstances an appeal may be dismissed by reason of a disregard of those rules. In this case we note that appellees have appeared and vigorously defended this appeal, notwithstanding the failure of appellant's counsel to timely serve and certify service of the petition of appeal. We have

before us a certified record sufficient to decide the crucial issues in the case.

We turn next to the contention of appellee DHHR that Rule 60(b), R.C.P. was violated because that contention focuses the case on the procedural requirements of the case below upon which it turns. This is a juvenile abuse and neglect proceeding, brought under the provisions of W.Va.Code § 49–1–1, *et seq.* Rule 81(a), R.C.P., in pertinent part, provides:

**Rule 81. Applicability in General.** *(a) To what proceedings applicable.—* ...

(7) Juvenile proceedings.—Rules 5(b), 5(e) and 80 apply, but the other rules do not apply, to juvenile proceedings brought under the provisions of Chapter 49 [§ 49–1–1 et seq.] of the West Virginia Code.

Accordingly, the procedure in abuse and neglect cases is governed by provisions internal to W.Va.Code § 49–1–1, *et seq.*, and such other procedural requirements of the Code or general law as obtain. Except for Rules 5(b), 5(e) and 80, the West Virginia Rules of Civil Procedure for Trial Courts of Record are not applicable to such cases.[3]

As noted, appellant assigns as error that she was not properly served with a copy of the petition and notice of hearing prepared at the commencement of this proceeding. West Virginia Code § 49–6–1(b) mandates the service on a parent or custodian of a copy of any petition charging abuse and neglect of a child, together with a notice of hearing, and provides for service by mail or publication when personal service is not accomplished.[4]

Appellant complains specifically that when service of the petition and notice by mail was attempted in this case in lieu of personal service, she did not sign the postal return receipt upon which the court below apparently based its first finding that the notice and petition had been duly served. Appellant asserts that, in fact, she never received or saw the petition during the pendency of the action below. Clearly, if appellant did not sign the postal receipt, the requirements of W.Va.Code § 49–6–1(b) for service of the notice and petition by mail have not been met.[5] The record before us is totally devoid of any inquiry by the court below to determine whose signature appears on the postal receipt which might contradict appellant's assertion in this appeal.

Appellees suggest to this Court that if the service of process by mail is defective, such defect is cured by the fact that appellant was found by the court below to have had actual notice of the proceedings. We do not reach the question of whether such a defect would be cured if appellant had actual notice. An-

**3.** We note also that the *Rules of Practice and Procedure For Family Law*, adopted by order of this Court July 21, 1993, and effective October 1, 1993, do not include within their scope actions brought under W.Va.Code § 49–1–1, *et seq.* The scope of those rules includes only proceedings brought under the authority of W.Va.Code § 48–1–1, *et seq.*, § 48A–1–1, *et seq.*, and habeas corpus proceedings involving child custody. Rule 1, *Rules of Practice and Procedure For Family Law.*

**4.** West Virginia Code § 49–6–1(b) provides, in pertinent part:

(b) The petition and notice of the hearing shall be served upon both parents and any other custodian, giving to such parents or custodian at least ten days' notice ... In cases wherein personal service within West Virginia cannot be obtained after due diligence upon any parent or other custodian, a copy of the petition and notice of the hearing shall be mailed to such person by certified mail, addressee only, return receipt requested, to the last known address of such person. If said person signs the certificate, service shall be complete and said certificate shall be filed as proof of said service with the clerk of the circuit court. If service cannot be obtained by personal service or by certified mail, notice shall be by publication in compliance with the provisions of article three [W.Va.Code § 59–3–1 et seq.], chapter fifty-nine of this code. A notice of hearing shall specify the time and place of the hearing, the right to counsel of the child and parents or other custodians at every stage of the proceedings and the fact that such proceedings can result in the permanent termination of the parental rights. Failure to object to defects in the petition and notice shall not be construed as a waiver.

**5.** We note also that no effort was ever made to effect service of the notice and petition on appellant by publication. Assuming that appellant retained her legal capacity to sue and be sued throughout this proceeding, service by publication in accord with the provisions of W.Va.Code § 49–6–1(b) may well have cured the difficulty presented by an attempted, but ineffective, service by mail.

terior to that question is the question of whether the court below was required to appoint a guardian ad litem for appellant and the question of what impact the failure to do so has on the validity of the order below terminating the parental rights of appellant. We conclude that the court was required to appoint a guardian ad litem and that the order terminating the parental rights of appellant must be set aside because of the failure of the court below to do so.

West Virginia Code § 56-4-10 is applicable to juvenile proceedings. It provides, in pertinent part:

> The proceedings in a suit wherein an infant or insane person is a party shall not be stayed because of such infancy or insanity, but the court in which the suit is pending, or the judge thereof in vacation, or the clerk thereof at rules, shall appoint some discreet and competent attorney at law as guardian ad litem to such infant or insane defendant, whether such defendant shall have been served with process or not, and after such appointment no process need be served on such infant or insane person ... Every guardian ad litem shall faithfully represent the interest or estate of the infant or insane person for whom he is appointed, and it shall be the duty of the court to see that the estate of such defendant is so represented and protected.... [6]

As early as April 29, 1994, the court below was advised by the fourth allegation in the abuse and neglect petition filed in this case that appellant had a history of mental illness. The DHHR Court Summary received by the court on May 6, 1994, gave some detail concerning that history, including at least approximate dates for prior hospitalizations. Then in August, 1994, the court received and noted information that appellant was in a mental institution in Minnesota. This was followed by the attempted, but apparently ineffective, service of process on appellant by certified mail at that mental institution after the court was advised that appellant had been located there and information regarding appellant's whereabouts had been given to the prosecuting attorney serving as counsel for the DHHR in this proceeding. At various stages throughout the proceedings, opportunities arose by which the court below was repeatedly made aware that appellant was hospitalized and restrained from appearing in court, or claimed not to have been served in a manner consistent with the plain directions of the statute, or was not represented by counsel in Ohio County, or desired to appear and defend and could not. Moreover, in 1995, before the court below made its order terminating the parental rights of appellant, the guardian ad litem appointed for the child, Lindsey C., served notice of a hearing for her motion requesting the appointment of a guardian ad litem for appellant. The order of the court below for that hearing dated February 1, 1995, reflects that the motion "as it relates to representation of" appellant was considered but reflects no action by the court granting or denying the motion. (That order, as previously noted, gives rise to this appeal.)

■ This Court held long ago that the suggestion of the lack of legal capacity imposes on the court the duty to appoint a guardian ad litem. *Hays v. Camden's Heirs*, 38 W.Va. 109, 18 S.E. 461 (1893), was an action in equity to sell lands allegedly forfeited to the State for non-entry on the land books. The trial court was advised that one of the owners was an infant by an exception taken to the report of a commissioner in chancery. Discussing that circumstance, this

**6.** We have noted and considered the somewhat asymmetrical design of W. Va.Code § 56-4-10. It is noted that the section recites that it applies to "[t]he proceedings in a suit wherein an infant or insane person is a party ...", thus indicating that the section applies to *any* such proceedings. The section further requires that a guardian ad litem appointed pursuant to the section "shall faithfully represent the *interest or estate* of the infant or insane person for whom he is appointed...." (Emphasis added.) We have noted that the sentence continues: "... and it shall be the

duty of the court to see that the *estate* of the defendant is so represented and protected." (Emphasis added.) The ambiguity thus created must be resolved in favor a construction which avoids an absurd result. As Justice Miller recently commented in another context, common sense dictates that if the section applies to "any" proceedings and the guardian ad litem is to represent the interest or estate of the persons, then the court is also to protect the interest or estate at issue. *See State ex rel. Morgan v. Trent*, 195 W.Va. 257, 265, 465 S.E.2d 257, 265 (1995).

Court, citing the predecessor section to the current W.Va.Code § 49–6–10, said:

> Under section 13, c. 125, Code 1887, it was the duty of the court to have appointed a guardian ad litem to the infant defendant, not because the court was selling the land of the infant, or of any strict construction in this case, but because the law requires it; … especially as the guardian, as next friend, appeared and suggested such infancy, and virtually asked such appointment. Under such circumstances it would have been done, and would be error not to do, in any court, as far as I know.

*Id.* 18 S.E. at 465.

In the case before us, the mental condition of appellant was clearly and strongly suggested to the trial court by the initial petition and by subsequent events. The court also had before it a written motion, duly set for hearing, asking for the appointment of a guardian ad litem for appellant. The motion was filed and brought on for hearing by the guardian ad litem for the child, Lindsey C., whose interests in a prompt conclusion of the proceeding would have been both protected and advanced by the appointment of a guardian ad litem for appellant.[7]

We are mindful that the court below did not have clear and direct proof before it that appellant was "insane" within the meaning of W.Va.Code § 56–4–10. We have also noted that, although Minnesota had on June 23, 1994, adjudicated appellant to be mentally ill and likely to be a danger to herself, and had required her confinement to continue until April, 1995, the statutory law of Minnesota preserved to appellant her capacity to sue and be sued, notwithstanding her adjudication and involuntary confinement.[8] Indeed, with respect to persons involuntarily hospitalized in West Virginia, W.Va.Code § 27–5–9(a), enacted in 1974, expressly preserves the legal capacity of persons involuntarily committed to a mental health facility, absent a separate and distinct proceeding to declare the patient "incompetent".[9] That section was part of a comprehensive updating of mental health law in this State, which now recognizes modern, more enlightened realities about mental illness and mental retardation. West Virginia law now provides persons suspected of suffering from mental illness or mental retardation, as well as patients involuntarily hospitalized, with an array of substantive and procedural protections not fully recognized or not fully articulated in earlier statutory enactments.[10] Finally, we note that prior to 1974, involuntary hospitalization for an indeterminate period deprived the patient of legal capacity.[11]

7. We commend the child's guardian ad litem for making and bringing her motion on for hearing, requesting the appointment of a guardian ad litem for appellant. Her attention to this issue was well directed at fully protecting the infant and insuring the finality of any order dealing with the child's future. That desirable finality is now postponed as a result of the failure of the trial court to rule on that motion.

8. Minnesota Statutes Annotated § 253B.23, Subd. 2(a) (West 1994), sets forth the legal results of commitment status as follows:

> Subd. 2. **Legal results of commitment status.** (a) Except as otherwise provided in this chapter and in sections 246.15 and 246.16, no person by reason of commitment or treatment pursuant to this chapter shall be deprived of any legal right, including but not limited to the right to dispose of property, sue and be sued, execute instruments, make purchases, enter into contractual relationships, vote, and hold a driver's license. Commitment or treatment of any patient pursuant to this chapter is not a judicial determination of legal incompetency except to the extent provided in section 253B.03, subdivision 6.

9. West Virginia Code § 27–5–9(a) provides:

> (a) No person shall be deprived of any civil right solely by reason of his receipt of services for mental illness, mental retardation or addiction, nor shall the receipt of such services modify or vary any civil right of such person, including, but not limited to, civil service status and appointment, the right to register for and to vote at elections, the right to acquire and to dispose of property, the right to execute instruments or rights relating to the granting, forfeiture or denial of a license, permit, privilege or benefit pursuant to any law, but a person who has been adjudged incompetent pursuant to article eleven [§ 27–11–1 et seq.] of this chapter and who has not been restored to legal competency may be deprived of such rights. Involuntary commitment pursuant to this article shall not of itself relieve the patient of legal capacity.

10. *See* W.Va.Code § 27–1–1, *et seq.*

11. *See* W.Va.Code § 27–5–4 (1965).

■ Accordingly, we are squarely confronted with the question of whether W.Va. Code § 56–4–10, relating to "insane" persons and last re-enacted by our Legislature in 1931, applies today in abuse and neglect proceedings only to adult persons who have been adjudicated incompetent, or applies with equal force to adult persons who have been involuntarily hospitalized by reason of mental illness but are not deprived of their civil rights in the absence of a separate and distinct declaration of incompetency. We conclude that in abuse and neglect proceedings the appointment of a guardian ad litem is required for adult respondents who are involuntarily hospitalized for mental illness, whether or not such adult respondents have also been adjudicated incompetent.

■ As noted, before 1974, the involuntary hospitalization of an adult for an indeterminate time by reason of mental illness would have required the appointment of a guardian ad litem under the provisions of W.Va.Code § 56–4–10. Put another way, the Legislature, in enacting W.Va.Code § 56–4–10, clearly contemplated that the section would be relied upon to require the appointment of a guardian ad litem for a mentally ill adult person involuntarily committed to a mental institution for an indeterminate period. The action of the Legislature in 1974, preserving capacity to such persons to sue or be sued in the absence of a separate incompetency finding, does not in our view mandate that the courts may not or should not appoint a guardian ad litem to protect the interests of such persons when they sue or are sued. We rely in part on a well recognized rule of statutory construction:

> Legislation is often written in terms which are broad enough to cover many situations which could not be anticipated at the time of enactment.... So a statute, expressed in general terms and written in the present or future tense, will be applied, not only to existing but also prospectively to future things and conditions.

As declared by the Tenth Circuit Court of Appeals: '... It is a general rule in the construction of statutes that legislative enactments in general and comprehensive terms, and prospective in operation, apply to persons, subjects and businesses within their general purview and scope, though coming into existence after their passage, where the language fairly includes them.'

Norman J. Singer, 2B *Sutherland Statutory Construction* § 49.02, at 2 (5th ed. 1992), *citing Cain v. Bowlby,* 114 F.2d 519 (10th Cir.1940).

Courts in other jurisdictions which have considered whether a guardian ad litem should be appointed for a person with mental illness who has not been adjudged incompetent appear to have uniformly favored appointment. *See In re the Matter of R.A.D. and J.D.,* 231 Mont. 143, 753 P.2d 862, 870 (1988) (requiring consideration of the appointment of a guardian ad litem even where the adult mentally ill person was represented by counsel); *Williams v. Pyles,* 363 S.W.2d 675, 678 (Mo.1963) (holding judgment voidable if rendered without appointment of guardian ad litem); *McKenna v. Garvey,* 191 Mass. 96, 77 N.E. 782, 784 (1906) (allowing a mentally ill person not adjudged incompetent to sue and be sued but noting that the appointment of guardians ad litem for such litigants is the general and equitable practice); *Hawley v. New York,* 28 Misc.2d 150, 217 N.Y.S.2d 107 (Ct.Cl.1961); *Sengstack v. Sengstack,* 4 N.Y.2d 502, 151 N.E.2d 887, 891, 176 N.Y.S.2d 337 (1958) (construing statutes authorizing appointment of a guardian ad litem to include unadjudicated incompetents); *Graham v. Graham,* 40 Wash.2d 64, 240 P.2d 564, 566 (1952) (recognizing the duty of the court, after full hearing, to withhold or cancel appointment if a mentally ill but unadjudicated person timely objects and shows cause); and Annotation, *Capacity of one who is mentally incompetent but not so adjudicated to sue in his own name,* 71 A.L.R.2d 1247 (1960).

■ The practical reasons for requiring appointment of a guardian ad litem in cases of involuntary commitment are readily apparent. First, despite the patient's continuing legal capacity, involuntary hospitalization imposes substantially all of the adverse effects of incarceration. These include the likely inability to freely move about, to prepare one's case, to consult with counsel conveniently, and to travel to and from court and

other places that might be necessary or helpful in preparing and assisting in one's case. Second, until the guardian ad litem conducts at least an initial investigation and reports to the court, it can not be known whether the mentally ill person actually received notice of the pending case or, if service of process is on its face good and sufficient, whether the mentally ill person understood the notice and fully appreciated the right to be heard and the right to be represented by counsel. In the case of indigent persons, the right to have counsel appointed to represent the litigant might or might not be fully appreciated. Until and unless an appreciation of such matters is established on the record, the ultimate finality of the court's dispositional orders may be subject to attack, either on direct appeal or by petition for an extraordinary writ. Last, the public interest in the finality of dispositional orders in these cases is a very persuasive, practical reason for the timely appointment of a guardian ad litem in these circumstances. For all these reasons, we hold, as in *Hays,* that it is error to enter a decree terminating parental rights after a suggestion of involuntary hospitalization for mental illness of the affected parent or custodian without first having appointed a guardian ad litem for such parent or custodian. *See Hays v. Camden's Heirs,* 38 W.Va. 109, 18 S.E. 461 (1893).

Having found that the appointment of a guardian ad litem is required in accord with W.Va.Code § 56–4–10 for an adult person involuntarily hospitalized, we caution against complete reliance on the provisions of that Code section with respect to the service of process and notice upon the guardian ad litem in lieu of service on an involuntarily hospitalized person for whom the court does not have before it clear evidence of an adjudication of incompetency. In pertinent part W.Va.Code § 56–4–10 provides, "... and after such appointment no process need be served on such infant or insane person". In light of the statute [W.Va.Code § 27–5–9(a) ]

preserving the civil rights of persons involuntarily hospitalized, unless that person has been adjudicated an incompetent in a separate proceeding, service of process and notices on the guardian ad litem alone could result in a failure to provide that level of notice and opportunity for meaningful hearing that is constitutionally required in any effort by the State to terminate parental rights. *See State ex rel. McCartney v. Nuzum,* 161 W.Va. 740, 248 S.E.2d 318 (1978) (requirements for the content of a petition charging abuse and neglect); *In re Sutton,* 132 W.Va. 875, 53 S.E.2d 839 (1949) (right of parents to notice of hearing); *State ex rel. LeMaster v. Oakley,* 157 W.Va. 590, 203 S.E.2d 140 (1974) (right to counsel in parental rights termination cases).[12] Those constitutionally required rights have been included in the requirements for the initiation of an abuse and neglect proceeding. West Virginia Code § 49–6–1(b) states:

(b) The petition and notice of the hearing shall be served upon both parents and any other custodian, giving to such parents or custodian at least ten days' notice ... A notice of hearing shall specify the time and place of the hearing, the right to counsel of the child and parents or other custodians at every stage of the proceedings and the fact that such proceedings can result in the permanent termination of the parental rights. Failure to object to defects in the petition and notice shall not be construed as a waiver.

In addition, W.Va.Code § 49–6–2(a) provides:

(a) In any proceeding under the provisions of this article, the child, his parents, his custodian or other persons standing in loco parentis to him ... shall have the right to be represented by counsel at every stage of the proceedings and shall be informed by the court of their right to be so represented and that if they cannot pay for the services of counsel, that counsel will be appointed. If ... [such persons] cannot pay for the services of counsel, the court

---

**12.** It has been suggested that *Lassiter v. Department of Social Services of Durham County, North Carolina,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), relieves this State of compliance with one or more of these protections which have been recognized in West Virginia as constitutionally mandated. We suggest that these protections are grounded in Art. III, § 10 of the Constitution of West Virginia in addition to whatever vitality they derive from the federal Constitution.

shall, by order entered of record, at least ten days prior to the date set for hearing, appoint an attorney or attorneys to represent [such parties] and so inform the parties . . . The court may allow to each attorney so appointed a fee in the same amount which appointed counsel can receive in felony cases. . . .

■ A parent or custodian named in an abuse and neglect petition who is involuntarily hospitalized for mental illness but who retains all of his or her civil rights, must be effectively served with process, including, if service is personal or by mail, service of a copy of any petition or other pleading upon which an order terminating parental rights may be based. In the consideration of any waiver of rights by reason of the failure to respond to process or by reason of other inaction, an affirmative record of service of process consistent with due process requirements of notice and meaningful opportunity to be heard may be pivotal to establishing that such waiver is effective, knowing and intelligent. Accordingly, in abuse and neglect cases, service of original process on a guardian ad litem appointed for a parent or custodian involuntarily hospitalized for mental illness whose legal capacity has not been terminated by law cannot be substituted in lieu of service on the hospitalized parent or custodian where the parental rights of such person may be terminated under the process to be served.

■ We turn now to the issue of the appointment of counsel. As set out in W.Va. Code § 49–6–2(a), appointment of counsel for parents and other custodians in abuse and neglect cases is contemplated in cases where the parent "cannot pay for the services of counsel. . . ." [13] "In child neglect proceedings which may result in the termination of parental rights to the custody of natural children, indigent parents are entitled to the assistance of counsel because of the requirements of the Due Process clauses of the West Virginia and United States Constitutions." Syl. pt. 1, *State ex rel. LeMaster v. Oakley,* 157 W.Va. 590, 203 S.E.2d 140 (1974). Appellant here argues that the court below erred in not appointing counsel for her, at least as soon as it appeared that appellant was confined in a mental institution. It is reasonable to assert on the record before us that the trial court below never had before it any clear, direct evidence from which it might conclude that appellant was unable to "pay for the services of counsel" and therefore never reached the issue of appointing counsel. On the other hand, it is equally reasonable to assert that at least when the court below learned of the hospitalization of appellant, in addition to her history as reflected by the Court Summary filed May 6, 1994, the court below had before it a strong suggestion of indigency.

In considering the contention that the court below erred in not appointing counsel for appellant, we take notice of the exceedingly high percentage of abuse and neglect cases coming before this Court in which appointed counsel appear on behalf of parents or custodians. It is reasonable to conclude that the experience of the trial courts of this State in that regard mirrors the experience here. We believe that that experience justifies the trial courts in indulging a presumption that the parent or parents and custodians entitled by law to be named in abuse and neglect petitions "cannot pay for the services of counsel". This presumption is also justified by the high importance which our State and its citizens attach to prompt and effective protection for abused and neglected children and to full, fair and meaningful opportunity for parents and custodians to be heard when allegations of abuse and neglect are made.

■ Therefore, circuit courts should appoint counsel for parents and custodians required to be named as respondents in abuse and neglect proceedings *incident to the filing of each abuse and neglect petition.* Upon the appearance of such persons before the court, evidence should be promptly taken, by affidavit and otherwise, to ascertain whether the parties for whom counsel has been appointed are or are not able to pay for counsel. In those cases in which the evidence rebuts the presumption of inability to pay as to one or more of the parents or custodians,

---

**13.** *See* W. Va.Code § 49–6–2.

the appointment of counsel for any such party should be promptly terminated upon the substitution of other counsel or the knowing, intelligent waiver of the right to counsel. Counsel appointed in these circumstances are entitled to compensation as permitted by law.[14]

We endorse the appointment of counsel for parents or custodians incident to the filing of an abuse and neglect petition as both judicially and financially economical. Judicial economy is achieved by the early appointment of counsel in that the case can then be promptly heard at its various stages with the expectation that all of the parties will be fully advised of the applicable procedures and possible results. It may be expected that all parties will then have a better understanding of the rights to which each party is entitled and the duties and obligations of parents and custodians and that there will be an increased likelihood that any permissible waiver of rights by litigants will be both knowing and intelligent. The ultimate benefit should be earlier finality of whatever dispositional order is justified by the law and the evidence. Financial economy follows from the true achievement of judicial economy. Avoiding delays like those which the facts of this case demonstrate have already occurred and avoiding the type of further delays which will flow from the additional proceedings which must now be had in this case will reduce the attendant costs of public services that have been rendered and will or may be provided to or on account of the litigants. Real savings are likely to be realized because of the timely prosecution, defense and disposition of these cases, that is to say, lower public expense overall, more than enough to compensate for the relatively few cases in which counsel may be appointed for a short time for parents or custodians who may be found able to pay for counsel's services.

■ If the appointment of a guardian ad litem is required for a parent or custodian, the trial court may also provide in its order appointing counsel or in a later order, a direction that the appointment imposes on that counsel the additional status of guardian ad litem, with the attendant duties of protecting the interests of the persons for whom such counsel is appointed guardian ad litem and the attendant duty on the court to see to the protection of such person's interests until and unless it later appears that such person's circumstances do not require the continued protection of a guardian ad litem or that the two functions cannot be performed by the same attorney. Recently, in the case *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993), this Court treated counsel appointed for *a child* who was the subject of an abuse and neglect case as the child's guardian ad litem and promulgated guidelines for the duties to be performed by a child's guardian ad litem. It is entirely appropriate in the case of a child to treat the two functions of counsel and guardian ad litem as being completely identical. The central purpose of an abuse and neglect proceeding is to ascertain and serve the best interests of the child. As we indicated in *Jeffrey R.L.*, counsel for the child is expected to pursue that central purpose even when his or her client, the child, may have a different view of what is in the child's best interests. We said: "The GAL [guardian ad litem] does not necessarily represent a child's desires but should formulate an independent position regarding relevant issues." *Id.* 435 S.E.2d at 175. We also noted there and restate here that: "Rule XIII of the *West Virginia Rules for Trial Courts of Record* provides that a guardian *ad litem* shall make a full and independent investigation of the facts involved in the proceeding, and shall make his or her recommendations known to the court." *Id.* at 177. Obviously, those recommendations may or may not be identical to those the child would make to the court, left entirely to his or her own choices. However, in the case of a child, justice is clearly best served by requiring that counsel and the court exercise their respective best judgment in all aspects of the case, and that the court have the benefit of counsel's candid and independent assistance in ascertaining the best interests of that child.

**14.** "The court may allow to each attorney so appointed a fee in the same amount which appointed counsel can receive in felony cases." W. Va.Code § 49–6–2(a).

Perhaps in most cases in which a guardian ad litem must be appointed for an adult in an abuse and neglect case, the functions of guardian ad litem and of counsel for the adult will likewise be identical in all respects. However, we recognize that in most such cases, the adult parent or custodian is likely to have a strong and clearly adversarial interest in resisting the relief sought for the child, especially the termination of that adult's parental rights. The potential for real conflict between the duties of a guardian ad litem and counsel for that adult is obviously greater.[15] One authority has identified three particular areas of potential conflict in the roles of guardian ad litem and counsel, even in cases involving counsel and guardians ad litem for children: (1) when the best interests of the ward and the ward's wishes are not identical, (2) when a privileged communication is made, and the attorney's duty to protect that communication conflicts with his or her duty as guardian, and (3) when a court would require a guardian ad litem to actually testify in a case, a function that counsel ordinarily should not perform.[16] *See* Rebecca H. Heartz, *Guardians Ad Litem in Child Abuse and Neglect Proceedings: Clarifying the Roles to Improve Effectiveness,* 27 Family Law Quarterly 327, 334–336 (1993). Accordingly, while we anticipate that such conflicts will rarely actually arise, we acknowledge that where such a dual status appointment of counsel and guardian ad litem for an adult has been made and actual conflict is deemed likely, the trial court may at any time, *sua sponte* or on the application of an interested party, terminate the dual status of counsel and guardian ad litem for such adult and appoint another attorney guardian ad litem so that counsel originally appointed may zealously represent the adult without concern for such conflict. Nonetheless, considering the relatively few cases in which a guardian ad litem may be required, the very considerable cost which the provision of publicly paid counsel for indigent parties imposes on this State, and the reported difficulty in obtaining counsel willing to accept court appointments,[17] we recommend the practice of dual appointment in any case in which, and to the extent which, the trial court finds that may be practical and fair.

In accord with the foregoing, we are compelled to reverse the judgment of the Circuit Court of Ohio County terminating the parental rights of appellant, Terri C., and remand this cause for further proceedings consistent with this opinion. Appellant is now entitled to the appointment of counsel below if she cannot pay for the services of counsel. She is entitled to traverse and otherwise defend against the allegations of the petition and to have full, meaningful hearings of the issues, with the assistance of counsel. The State is required to meet its burden of proof as required by law without regard to any prior determination by the court below adverse to appellant's interests and the parties are entitled to such other relief, including a proper dispositional order, as may be appropriate under the law and the evidence adduced.

Reversed and remanded with directions.

**15.** Some jurisdictions require a greater distinction between the offices of counsel and guardian ad litem. *See In re the Matter of R.A.D. and J.D., supra,* and *People In the Interest of M.M.,* 726 P.2d 1108 (Colo.1986), the latter case discussing a Colorado procedure by which either but not necessarily both officers are to be appointed. *See also Stanton v. Sullivan,* 62 R.I. 154, 4 A.2d 269, 270 (1939), and *Dawson v. Garcia,* 666 S.W.2d 254, 265 (Tex.App. 5 Dist.1984).

**16.** Conflict can be anticipated from any matter which would actually inhibit the zealous representation of a client's interests or the actual ability of the guardian ad litem to employ his or her best independent judgment in pursuit of the best interests of the mentally ill person.

**17.** We are mindful of the plea, made on oral argument in this case by the counsel to the DHHR from the prosecutor's office in Ohio County, that difficulty had been and would be experienced in finding members of the bar who would take appointments in abuse and neglect cases. We assume that the difficulty will arise with respect to service as either counsel or guardian ad litem. We recognize the financial hardships that are sometimes created for members of the bar, particularly younger lawyers, when they are asked to accept appointments without the assurance of fair payment. We encourage members of the bar to accept these burdens willingly and commend those who accept such appointments. Pursuant to the provisions of W. Va.Code § 49–6–2(a), we suggest that circuit courts should allow fees as permitted by law whenever proper application is made by appointed counsel.

WORKMAN, Justice, dissenting:

## HOW MANY ANGELS CAN DANCE ON THE HEAD OF A PIN?

The majority has embarked on an extended and meandering expedition through the law of abuse and neglect. Prior to the enrollment of this opinion in the annals of the law, we had endeavored to develop some semblance of order and ease of application in the requirements of this area of the law. Experience has shown that neglect and abuse law should be kept as simple and humane as possible. The last thing we need in this area is a "how many angels can dance on the head of a pin" approach with lots of meaningless procedural hoops to jump through. It must be remembered: "Rules of practice and procedure are devised to promote the ends of justice, not to defeat them." *Hormel v. Helvering*, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). With the majority's presentation of this obscure and easily misconstrued opinion, I have several significant areas of concern.

### I.

### NOTICE

First, the majority is troubled by the notice of termination proceedings received by the Appellant in this case. The petition requesting termination of parental rights was apparently filed on April 29, 1994. On May 9, 1994, a copy of the petition was sent by certified mail to the Appellant at her mother's home address. That attempt at service was returned to sender. By August 19, 1994, the court and DHHR were apparently aware of the Appellant's involuntary hospitalization and the address of the mental institution. On August 22, 1994, the petition was received on behalf of the Appellant at the mental institution by a person whose signature is not legible. The Appellant now claims that she did not receive such mailing. By January 1995, a West Virginia protective services worker had contacted the Appellant's caseworker regarding the termination proceedings, and in the March 1, 1995, order, the lower court found that the Appellant did receive actual notice of these proceedings.

In dealing with this notice issue, the majority quotes West Virginia Code § 49–6–1(b) regarding service of process and acknowledges that if neither personal service nor service by mail can be obtained, notice by publication is required. Noting that notice by publication was not attempted in this case, the majority states that notice by publication "may" have cured the deficiencies of notice in this case. The majority then references the Appellees' argument that since the lower court found that the Appellant did indeed receive actual notice of the termination proceedings, any defect in service of process is cured. Apparently not wishing to confront that assertion, the majority somewhat abruptly concludes that it will "not reach the question of whether such a defect would be cured" by the fact that the Appellant received actual notice. The majority then launches into an examination of the necessity of a guardian ad litem, returns to the notice issue several pages later, requotes section 49–6–1(b), and concludes that notice served upon a guardian ad litem rather than the involuntarily hospitalized parent is insufficient.

Where in that discussion is a precise, unequivocal statement of the law of notice to parents in termination proceedings? Where is a concrete message regarding resolution of the issue of a missing parent[1] and the inability to serve notice? According to the majority, strict adherence to the provisions of section 49–6–1(b) allowing service by publication "may" have cured the problem in this case. That further fouls the waters by suggesting that even faithfulness to the statutory scheme *may* not have been enough. This opinion leaves us in great confusion.

My predominant concern is that we do not allow the mechanics of the notice issue to overshadow the obligation to expeditiously resolve the underlying issue of the rights, safety, and custody of the children. In child abuse and neglect cases, the best interests of

---

1. In many of these cases, there is a missing or abandoned parent and not a clue as to their whereabouts. The majority now muddies up the waters as to what constitutes proper notice in the event it is ascertained much later that they were institutionalized.

the child are the paramount concern. Although the majority apparently has difficulty perceiving specificity within section 49–6–1(b), it appears clear to me that those rules unambiguously define the requirements of notice.[2] Equally evident is the intent that individuals for whom a guardian ad litem is appointed under West Virginia Code § 56–4–10[3] are not entitled to personal service of process. That section, relied upon by the majority as justification for requiring a guardian ad litem for the Appellant, specifically provides that "after such appointment no process need be served on such infant or insane person.…" The majority feels perfectly comfortable stretching the "infant or insane" language to include persons involuntarily hospitalized by reason of mental illness in the context of justifying the requirement of a guardian ad litem. Yet the majority draws the line on literal compliance with the same statute when it arrives at the issue of notice, apparently reasoning that such persons have not been formally deprived of their civil rights to service in the absence of a declaration of incompetency.

Why not adhere to the statutes as written? If section 56–4–10 justifies the appointment of a guardian ad litem, why not simply follow the mandate of that section and allow the guardian to accept service of process? Prior to the appointment of the guardian ad litem, section 49–6–1(b) should govern, permitting notice by publication to suffice if personal service or service by mail is not possible. If a parent is absent, our prior statement in syllabus point six of *In re Christina*, 194 W.Va. 446, 460 S.E.2d 692 (1995), should still govern: "When the West Virginia Department of Health and Human Resources seeks to terminate parental rights where an absent parent has abandoned the child, allegations of such abandonment should be included in the petition and every effort made to comply with the notice requirements of W.Va.Code,

2. The only Rules of Civil Procedure regarding the notice requirement and applicable to child abuse and neglect cases are Rules 5(b) and 5(e), as follows:

 (b) Same: How Made. Whenever under these rules service is required or permitted to be made upon a party represented by an attorney of record the service shall be made upon the attorney unless service upon the party himself is ordered by the court. Service upon the attorney or upon a party shall be made by delivering a copy to him or by mailing it to him at his last-known address or, if no address is known, by leaving it with the clerk of the court. Delivery of a copy within this rule means: Handing it to the person to be served; or leaving it at his office with his clerk or other person in charge thereof; or, if the office is closed or the person to be served has no office, leaving it at his usual place of abode with some member of his family above the age of 16 years. Service by mail is complete upon mailing.

 (e) Filing With the Court Defined. The filing of pleadings and other papers with the court as required by these rules shall be made by filing them with the clerk of the court, who shall note thereon the filing date, except that the judge may permit the papers to be filed with him, in which event he shall note thereon the filing date and forthwith transmit them to the office of the clerk; the notation by the clerk or the judge of the filing date on any such paper constitutes the filing of such paper, and such paper then becomes a part of the record in the action without any order of the court.

3. West Virginia Code § 56–4–10 provides as follows, emphasis provided:

 The proceedings in a suit wherein an infant or insane person is a party shall not be stayed because of such infancy or insanity, but the court in which the suit is pending, or the judge thereof in vacation, or the clerk thereof at rules, shall appoint some discreet and competent attorney at law as guardian ad litem to such infant or insane defendant, whether such defendant shall have been served with process or not, **and after such appointment no process need be served on such infant or insane person.** If no such attorney be found willing to act, the court, or the judge thereof in vacation, may compel him to act, or appoint some other discreet and proper person in his stead; but the attorney or other person so appointed shall not be liable for costs. Every guardian ad litem shall faithfully represent the interest or estate of the infant or insane person for whom he is appointed, and it shall be the duty of the court to see that the estate of such defendant is so represented and protected. And the court, or the judge thereof in vacation, whenever of opinion that the interest of an infant or insane person requires it, shall remove any guardian ad litem and appoint another in his stead. When, in any case, the court or judge is satisfied that the guardian ad litem has rendered substantial service to the estate of an infant or insane defendant, it may allow him reasonable compensation therefor, and his actual expenses, if any, to be paid out of the estate of such defendant.

49–6–1 (1992)."[4] Once a guardian ad litem is appointed, the guardian, cloaked with authority to act on behalf of the individual by the very nature of his/her appointment, should be permitted to accept service of process on behalf of the parent, as is the intent of section 56–4–10.

## II.

### JUMPING THROUGH HOOPS

The majority also fails to identify the time at which a court must appoint a guardian ad litem. Syllabus point three of the majority opinion states the rule that a guardian is required where the person is involuntarily hospitalized, and yet syllabus point four states that it is error to terminate parental rights without a guardian ad litem where there has been a "suggestion" of involuntary hospitalization for mental illness. That leaves the door cracked open on the issue of exactly when this duty to appoint a guardian ad litem is triggered. I disagree with the majority's apparent conclusion that the "suggestion" of the Appellant's mental condition was an adequate basis for the appointment of a guardian ad litem. Unless and until a court is informed of legal incapacity or involuntary commitment, that court should be under no duty to appoint a guardian ad litem. A "suggestion" of a mental condition is much too amorphous and indeterminate to be utilized as a standard for the appointment of a guardian ad litem.

The one saving grace the majority includes in its guardian ad litem requirement is that the trial court may, in its order appointing counsel, provide that the appointment imposes the additional status of guardian ad litem. Now that the majority has cast so much doubt as to exactly what (even a suggestion or suspicion of mental illness?) may create the obligation to appoint a guardian ad litem and so much confusion as to how a parent with some "suggestion" of mental illness may be notified, I recommend that the circuit courts routinely couch the orders appointing counsel in those terms. In fact, I will propose that the new Rules of Procedure for Child Abuse and Neglect Proceedings now out for public comment until August 15, 1996, include that requirement. Judicial training will have to be held at the next conference, and we'll get this esoteric hoop jumped. Whew! What a lot of trouble—for what real gain?

## III.

### CHILDREN ARE PEOPLE, TOO

The majority, in the midst of its discussion of the potential conflict in the roles of a guardian ad litem and an attorney for the parent, states that "[i]t is entirely appropriate in the case of a child to treat the two functions of counsel and guardian ad litem as being completely identical." The majority imparts the impression, to which I object most strenuously, that the adult litigant should have rights which exceed those of the child, suggesting to me that the child is considered a person with a lesser entitlement to rights than the adult. The majority hypothesizes that conflicts could emerge between the roles of guardian ad litem and counsel for the adult, yet deftly dismisses even the possibility that such conflicts could also occur in the roles of guardian ad litem and counsel for the child. If the majority believes an adult may be entitled to both appointed counsel *and* a guardian ad litem, how can they blithely presume that an individual can always operate in both capacities simultaneously for a child?

We commented upon the general expectations of a guardian ad litem for a child in abuse and neglect proceedings in syllabus point five of *In re Jeffrey R. L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993):

Each child in an abuse and neglect case is entitled to effective representation of counsel. To further that goal, W.Va.Code, 49–6–2(a) [1992] mandates that a child has a right to be represented by counsel in every stage of abuse and neglect proceedings. Furthermore, Rule XIII of the West Virginia Rules for Trial Courts of Record provides that a guardian ad litem shall make a full and independent investigation

---

**4.** We recognized in *In re Christina* that abandonment of a child by a parent "constitutes grounds for termination of parental rights." *Id.* at 456, 460 S.E.2d at 702.

of the facts involved in the proceeding, and shall make his or her recommendations known to the court. Rules 1.1 and 1.3 of the West Virginia Rules of Professional Conduct, respectively, require an attorney to provide competent representation to a client, and to act with reasonable diligence and promptness in representing a client.

We also summarized the guardian ad litem's role in syllabus point three of *In re Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991), as follows:

In a proceeding to terminate parental rights pursuant to W.Va.Code, 49–6–1 to 49–6–10, as amended, a guardian ad litem, appointed pursuant to W.Va.Code, 49–6–2(a), as amended, must exercise reasonable diligence in carrying out the responsibility of protecting the rights of the children. This duty includes exercising the appellate rights of the children, if, in the reasonable judgment of the guardian ad litem, an appeal is necessary.

We further elaborated in syllabus point five of *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991), that "[t]he guardian ad litem's role in abuse and neglect proceedings does not actually cease until such time as the child is placed in a permanent home." In syllabus point five of *In re Christina*, 194 W.Va. 446, 460 S.E.2d 692 (1995), we acknowledged that the wishes of the child regarding continued visitation or other contact with the parent should be considered, as follows:

When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest.

Just as some circumstances may present conflict between the role of guardian ad litem

and counsel for the parent, those roles may also conflict in the case of the child. Part I B–2 of the Standards of Practice for Lawyers Who Represent Children in Abuse and Neglect Cases, adopted by the American Bar Association in February 1996, provides guidance on this issue and provides as follows:

Conflict Situations.

(1) If a lawyer appointed as guardian ad litem determines that there is a conflict caused by performing both roles of guardian ad litem and child's attorney, the lawyer should continue to perform as child's attorney and withdraw as guardian ad litem. The lawyer should request appointment of a guardian ad litem without revealing the basis for the request.

(2) If a lawyer is appointed as a "child's attorney" for siblings, there may also be a conflict which could require that the lawyer decline representation or withdraw from representing all of the children.

Comment-

The primary conflict that arises between the two roles is when the child's expressed preferences differ from what the lawyer deems to be in the child's best interests. As a practical matter, when the lawyer has established a trusting relationship with the child, most conflicts can be avoided. While the lawyer should be careful not to apply undue pressure to a child, the lawyer's advice and guidance can often persuade the child to change an imprudent position or to identify alternative choices if the child's first choice is denied by the court.

The lawyer-client role involves a confidential relationship with privileged communications, while a guardian ad litem-client role may not be confidential. Compare Alaska Bar Assoc. Ethics Op. # 854 (1985) (lawyer-client privilege does not apply when the lawyer is appointed to be child's guardian ad litem) with *Bentley v. Bentley*, [86 A.D.2d 926] 448 N.Y.S.2d 559 (App.Div.1982) (communication between minor children and guardian ad litem in divorce custody case is entitled to lawyer-client privilege). Because the child has a right to confidentiality and advocacy of his or her position, the child's attorney can

never abandon this role. Once a lawyer has a lawyer-client relationship with a minor, he or she cannot and should not assume any other role for the child, especially as guardian ad litem. When the roles cannot be reconciled, another person must assume the guardian ad litem role. *See* Arizona State Bar Committee on Rules of Professional Conduct, Opinion No. 86–13 (1986).

The Ohio Supreme Court, in *In re Baby Girl Baxter*, 17 Ohio St.3d 229, 479 N.E.2d 257 (1985), resolved a situation of conflict in the two roles by holding:

> [W]hen an attorney is appointed to represent a person and is also appointed guardian ad litem for that person, his first and highest duty is to zealously represent his client within the bounds of the law and to champion his client's cause. If the attorney feels there is a conflict between his role as attorney and his role as guardian, he should petition the court for an order allowing him to withdraw as guardian. The court should not hesitate to grant such request.

*Id.* at 232, 479 N.E.2d 257. As part of Ohio's reformation of temporary and permanent custody actions in 1988, R.C. 2151.281(H) was added to the Ohio Code. Closely tracking the language of *Baby Girl Baxter*, it provides, in pertinent part, as follows:

> If a person is serving as guardian ad litem and counsel for a child and either that person or the court finds that a conflict may exist between the person's roles as guardian ad litem and as counsel, the court shall relieve the person of his duties as guardian ad litem and appoint someone else as guardian ad litem for the child.

*See also In re Shaffer*, 213 Mich.App. 429, 540 N.W.2d 706 (1995) (holding that while one person can simultaneously act as guardian ad litem and attorney for the children in an appropriate case, conflicts in those roles may require appointment of a guardian ad litem separate from the attorney).

In *Newman v. Newman*, 235 Conn. 82, 663 A.2d 980 (1995), the Supreme Court of Connecticut expressed concern regarding the creation of "conflict in the attorney's role by conflating the role of counsel for a child with the role of a guardian ad litem or next friend." 663 A.2d at 987.

Typically, the child's attorney is an advocate for the child, while the guardian ad litem is the representative of the child's best interests. As an advocate, the attorney should honor the strongly articulated preference regarding taking an appeal of a child who is old enough to express a reasonable preference; as a guardian, the attorney might decide that, despite such a child's present wishes, the contrary course of action would be in the child's long term best interests, psychologically or financially.

*Id.* at 987–88. The division of roles may be "necessary to make sure that the attorney for the children will not be faced with the dilemma of reconciling such diverging interests while conforming to her role as advocate." *Id.* at 990.

The reality is that abused and neglected children frequently *want* to be returned to their parents, for that is all they know, and despite the abuse, there usually still is an emotional bond. As we explained in *Christina*, as quoted above, the wishes of the child are not to be disregarded. *Id.* at 448, 460 S.E.2d at 694, syl. pt. 5. West Virginia Code § 49–6–5(a)(6), regarding the disposition of neglected or abused children, also requires a child's wishes to be considered in some instances. That statute, in pertinent part, emphasis added, provides as follows:

> (6) Upon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future, and when necessary for the welfare of the child, terminate the parental or custodial rights and/or responsibilities of the abusing parent and commit the child to the permanent sole custody of the nonabusing parent, if there be one, or, if not, to either the permanent guardianship of the state department or a licensed child welfare agency. If the court shall so find, then in fixing its dispositional order, the court shall consider the following factors: (1) The child's need for continuity of care and caretakers; (2) the amount of time required for the child to be integrated into a stable and permanent

home environment; and (3) other factors as the court considers necessary and proper. Notwithstanding any other provision of this article, **the permanent parental rights shall not be terminated if a child fourteen years of age or older or otherwise of an age of discretion as determined by the court, objects to such termination.**

Dissimilarly, there is almost always a community of interest in the wishes of an allegedly abusive parent and the legal position adopted on his or her behalf by appointed counsel. Thus, there is far greater potential for a conflict in the representation of a child than in the representation of an adult in an abuse and neglect case.

It is not so much the result in the present case with which I so vehemently disagree; it is the potential ramification of future interpretation and attempted application of this very rambling opinion, full of confusing ideas and standards, which disturbs me profoundly. Lastly, I must observe that the entire tenor of the majority opinion sounds in the rights of the Appellant. We recently observed in syllabus point seven of *In re Brian D.*, 194 W.Va. 623, 461 S.E.2d 129 (1995) that "[c]ases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren)." It is not simply the rights of the parents with which we must be concerned in an abuse and neglect setting; rather, the rights of the children must be the foremost, preeminent responsibility. The rights of the children cannot be obfuscated under the guise of protection of the procedural rights of the parents.

For the reasons set forth above, I respectfully dissent.